## THURMAN *vs.* WELLS, FARGO and others.

A mere right of action, for an unliquidated unrecognized claim, arising, *ex delic-to*, cannot be assigned, so as to enable the assignee to sue in his own name.

So held in respect to a claim against the defendants as alleged common carriers, for a breach of duty.

The common law rule on this subject is not altered by the code.

Such choses and rights as were assignable before the code took effect are still assignable, and no others.

The *extent* of a common carrier's liability does not depend upon the terms of his contract: it is declared by law, and is fixed by considerations of public pol-icy outside and independent of his contract. Hence an action against him for a breach of duty, in omitting to deliver property entrusted to him, arises not out of the contract, but is founded on the general obligations of the common law.

Where individuals are carriers of certain kinds of property from one given place to another, they cannot be compelled, against their will, to become carriers from intermediate places. Therefore, when property is alleged to have been deliv-ered to an agent of carriers, at an intermediate point, his right to receive it at that place, is a pertinent and important inquiry upon the trial of an action against the carriers for an omission to deliver the property; and it is error to exclude evidence upon that question.

If the act upon which common carriers are sought to be charged is the act of an agent, his authority must be made out, and is a question of fact for the jury.

Where an express company advertise that a faithful special messenger will be sent in *charge* of each express, to its destination, this does not imply any authority in the messenger to engage for, or receive freight, at intermediate ports, for his principals.

When a party is sought to be made liable for the acts of his agent, the author-ity of the agent, to bind his principal, must be proved, either expressly or im-pliedly, from his conduct as sanctioned by his principal.

A party is not responsible for the acts of another as his agent, except upon an ac-tual delegation of power, or one implied from the characteristic designation of the agent, or the sanctioning of his conduct, implying the nature of his authority.

THIS was an appeal by the defendants from a judgment en-tered against them at a special term, upon the verdict of a jury. The complaint alleged that on or about the 16th of October, 1852, at Panama, New Grenada, one Andrew Spencer delivered to the defendants, as common carriers, under the name and style of " Wells, Fargo & Co.," from California, and from Panama, Chagres and Navy Bay to New-York, and also from the city of New-York to those ports and places, by W. H. Backus, the agent

Thurman *v.* Wells.

and messenger of the defendants, a quantity of gold dust and coin, to be conveyed from Panama to New-York, for a certain reasonable reward to be paid to the defendants, and there safely delivered to said Spencer. But that the defendants, not regarding their duty as such common carriers, did not safely and securely convey the same to New-York, nor deliver the same, or any part thereof, to said Spencer; but that they so *carelessly* and *negligently* behaved and conducted themselves, in the premises, that the said property became and was wholly lost to the said Spencer, and to the plaintiff, and that on the 1st of November, 1852, Spencer, for a valuable consideration, sold, transferred and assigned to the plaintiff all his claim and demand, and cause of action against the defendants, by reason of the loss of the gold dust and coin ; also all his, Spencer's, right and ownership of, in and to, the said gold dust and coin, with full right to receive, recover and receipt for the same.

The answer denied that the defendants were common carriers ; that Spencer delivered any gold dust or coin to them as common carriers ; that Spencer delivered to Backus as their agent, or that as such he received, said gold dust or coin ; that Spencer delivered to them, or that they received said gold dust or coin to be conveyed for reward ; that Backus had any authority to receive said gold dust or coin for them ; or that through their carelessness or negligence Spencer lost said gold dust or coin. The answer also denied the assignment to the plaintiff.

On the 9th of June, 1853, the cause came on to be tried before Justice Barculo and a jury, at the circuit in Kings county.

Upon the opening of the cause, the defendants' counsel moved that the complaint be dismissed, because the cause of action was not assignable, so as to enable the assignee to sue in his own name. This motion was denied, and the defendants excepted. The plaintiff then proved, and read in evidence, the assignment from Spencer to the plaintiff. Spencer, the assignor, was examined by him as a witness, although objected to as incompetent. At the close of the plaintiff's testimony the defendants moved that the complaint be dismissed, on the following grounds:

1st. That the assignment was of a thing in action, not arising

out of *contract*, and therefore that it could not authorize the assignee to bring the action in his own name. 2d. That the defendants were not *common carriers*, but express forwarders. 3d. That even if common carriers, they were not liable for property not delivered to them at New-York, or San Francisco. 4th. That there was not sufficient proof of Backus' authority to receive the gold and gold dust for the defendants as carriers, even if they would have been otherwise liable. The motion was denied, and the defendants excepted. Wm. H. Backus was examined as a witness on the part of the defendants, and testified as follows: "Am a messenger of Wells, Fargo & Co.; I, as such, accompany the freight from New-York to San Francisco, consisting of packages sent by them of goods, not treasure; I have nothing to do with treasure; my business going out is to see that the stuff in my charge gets across the Isthmus, that it is landed in time; I have nothing to do with providing the mules; my agency is the same in coming this way; as such messenger I have no charge of such gold dust and treasure as may be shipped by them." Q. "What authority had you in October last from Wells, Fargo & Co., to receive gold dust, after you left San Francisco?" This question was objected to by the plaintiff's counsel. The objection was sustained, and the decision was excepted to by the defendants' counsel. The witness proceeded: "I got acquainted with Spencer shortly after we left San Francisco in the Tennessee; he might have spoken to me about the gold before we reached Panama; at Panama, or very near there, he told me that his belt had got open in the purser's safe, and he had lost some of the slugs; he went back to the purser and found the missing slugs in his safe; he said he had just been sewing the belt up again; that he did not know what to do with the stuff; that he had nothing to take it ashore in but a common carpet bag; he wanted to know of me how my stuff went ashore; I told him I had no stuff to go ashore but one trunk for the express company, and my own trunk; he spoke about the gold dust, and I told him that I had nothing to do with landing the gold dust; he then asked me if I had a trunk in which he could put the dust and coin to go ashore; I told him he could

put it in my trunk if he wished to; he went down into his state-room, which was in the second cabin, and brought it up; I went to my state-room and found that the person in it with me was changing his clothes ready to go ashore; Mr. Spencer then stepped to the opposite state-room and laid it down there, and we both sat down waiting for an opportunity to go in; when my room-mate came out I opened my trunk, made a place in it, removing some of my clothes, and Spencer laid the money in; I had my own trunk which contained my baggage, a trunk of Wells, Fargo & Co., which contained newspapers, and two car-pet-bags which contained newspapers and some clothing; Spen-cer put the gold into my own private trunk; nothing was in it but my own private apparel; no newspapers were in it; nothing was said about paying me for taking it ashore; I made no charge for taking it ashore; after we had got to shore I spoke to Spencer about gold and dust; he said that he had no way to take it across except his carpet-bag, and he was afraid that was not strong enough, and it was too warm to wear his belt; he wanted to know of me if the express company would take it across for him; I told him there was no agent there to receive any thing for the company, that the defendants had a contract with the mule company there to take our stuff; he then wanted to know if the company that carried the gold dust would not take it and carry it across for him; I told him that I supposed not, in the condition in which it was, but I would ask Mr. Hur-tado, and let him know; he is the man who ships the treasure across the Isthmus; I asked Mr. Hurtado, but he said that he could have nothing to do with forwarding passengers, their bag-gage or dust; I told Spencer so; Spencer then asked me if I could not let it remain in my trunk going across the Isthmus; I told him I should not disturb any thing in my trunk across, and that if he chose to let it remain there he could do so; he replied that he had as lief risk it there as any where else, if I was willing it should remain there; nothing was said about com-pensation; I made no agreement to receive it for the express company; I was not asked to receive it for the express com-pany; I did not receive it for them; on our way he said he

ought to follow up the trunk and keep track of it; I said it would be very fatiguing to follow a pack mule; he wanted to know if the owner of the mule would be responsible for it, provided the trunk was lost; I told him I supposed not, as it could not properly be called baggage; all that they could be held for would be baggage; I had not notified them that it contained treasure; the money remained in it till we got to Navy Bay, where the steamer is taken, on the Atlantic; he then told me that he had not money enough to pay his fare to New-York; I told him it was best not to open the trunk on the dock, but to wait till we got aboard and I got a state-room; he borrowed the money for his ticket from a passenger; we went aboard; the next morning he came to me for his money; I took him to my state-room; opened the trunk, and he took out his belt, and took some slugs; I don't know how much; probably I did not at the time; he said nothing at that time about taking the money back again into his possession; I supposed that he would take it back; nothing was said about his taking the money after we got on board the Georgia; when we got to Kingston, early in the morning, I went ashore with Mr. Spencer, and he made some purchases; we were about to return to the steamer when he met a passenger and walked with him; I took his package aboard and put it in my state-room; the ship-boy took the key at first from me to put the room to rights; when I got back I took the key; half an hour afterwards I had the key; I locked the state-room and gave the key to my room-mate; there was but one key; I told him that it would be necessary to keep his eye on it; he said that he would keep his eye on it; I was gone three or four hours; when I came back toward the ship I met Spencer, who related his loss; that he had gone down and discovered his loss; that he had found the trunk open and found the gold gone; those were the circumstances of his loss; we went ashore and engaged police to look around for the thief; after we sailed from Kingston, I told Spencer that I considered it a very hard case, that I was willing to do any thing that he required me; Spencer said that he did not consider me to blame at all, that he ought to have taken his dust to the purser when he got on board the

Georgia, and paid him for taking care of it; Spencer said nothing to me about Wells, Fargo & Co.; I told him it would ruin me with Wells, Fargo & Co., and lose my place; he said they should know nothing about it; that of course he had no claim on them; that they probably would never hear of it; I had several conversations with Spencer about ferreting out the thief; that he must attend to it when he got to New-York; that I would be busy there; he told me that he had made arrangements to have the ship anchored in the stream, and have the policeman on board; I reported the loss in the office at New-York to Rochester, the clerk, in the morning."

The court charged, that the defendants were common carriers of gold dust and gold; that Backus, as their messenger, was authorized to receive gold and gold dust on their account, to be carried by them and on their responsibility. That if the property was delivered by Spencer to Backus, as the messenger of the defendants, then they were liable under the circumstances, and the verdict must be for the plaintiff. But if it was delivered to him as a private person, and not as such messenger, then the verdict must be for the defendants, and that this was the sole inquiry for the jury. The defendants' counsel excepted to this charge. The jury rendered a verdict for the plaintiff for the sum of $4900.

*E. L. Fancher,* for the plaintiff. I. This is an ordinary action against common carriers; and a contract, express or implied, is always involved in such an action : it arises out of contract; and the plaintiff seeks to recover damages for the breach of the contract. (*Clor* v. *Mallory,* 1 *Code R.* 126.) As to the form of the declaration under the old practice, it may be either in *assumpsit* or on *the case.* (*Flynn* v. *The Hudson River Railroad Co.* 6 *How. P. R.* 310.) It cannot be said, therefore, that the claim sued upon, and for which the verdict was rendered in this action, was "a thing in action *not arising out of contract,*" as intended by § 111 of the code. (*Orange Bank* v. *Brown,* 3 *Wend,* 158.) II. But if it be granted that, by reason of § 111 of the code, the cause of action could

not be assigned, so as to authorize the action to be brought in the name of the assignee, still that objection cannot now be made : Because, (1.) It is a " defect of parties" (*sub.* 4 *of* § 144) that appeared " on the face of the complaint ;" and the defendants could have demurred. (2.) The objection was not taken either by demurrer or answer ; and the defendants, therefore, " shall be deemed to have waived the same." (*Code*, § 148.) III. It is, at most, but a technical objection, and ought not to be listened to, either at the trial or after the verdict ; for it must be conceded that such a cause of action as this is assignable, and that the assignee is vested with the entire interest. (*Robinson* v. *Weeks*, 6 *How. P. R.* 161. *The People* v. *Tioga C. P.* 19 *Wend.* 77.) IV. The defendants were common carriers, for hire or reward, of gold dust and coin, and other property, on the entire route from California, via Panama, Navy Bay, &c., to New-York ; and they held out to the world, in the most notorious manner, that such was their public employment. They were not merely " forwarders," but were interested in the freight earnings, and undertook, themselves, to be the carriers ; they had in their business all the incidents of common carriers, and they should not be permitted to decline the liability that the law imposes on them in that capacity. See their advertisements. V. The treasure in question was delivered by Spencer to the defendants' messenger, Backus, as their agent, to be safely carried to New-York ; he trusting to the express company, composed of the defendants. This fact was found by the jury, after being properly submitted to them. That delivery was sufficient : " A delivery to a carrier's servant is a delivery to himself, and shall charge him, if they be goods such as it is the custom of the carrier to carry, not out of his line of business." (*Esp. Dig.* 622.) The maxim "*respondet superior*" applies. (*Angel on Carriers*, § 91. *Muschamp* v. *Lancaster and Preston Railway Co.* 8 *M. & Wels.* 421.) VI. It is quite immaterial what were the private arrangements between the defendants and their messengers, or between the defendants and the owners of the steamers. The true questions are : what authority had Spencer the right to

Thurman *v.* Wells.

suppose the messenger possessed? (*Story on Agency,* §§ 130–133.) What were the acts of the messenger? (4 *Wend.* 394.) Did the messenger, on receiving that treasure to carry, act within the scope of that authority? And did Spencer trust to the security of the express company? (*Ang. on Carriers,* §§ 136, 137.) VII. Nor is it a matter of any consequence that the defendants do not own the steamers, or the isthmus mule trains; inasmuch as the defendants themselves undertake to carry the treasure, &c. for reward, over the lines in question. (*Fairchild* v. *Slocum,* 19 *Wend.* 329.   *Teall* v. *Sears,* 9 *Barb.* 317.   *Moore* v. *Evans,* 14 *Id.* 524.   *Miller* v. *The Steam Nav. Co.* 13 *Id.* 363.) VIII. If the treasure was delivered to Backus, as the messenger of the defendants, and Spencer relied upon the responsibility of "Wells, Fargo & Co.'s Express," as the jury have determined, then the defendants were clearly liable as common carriers. (*Weed* v. *Schenectady and Sar. Railroad Co.* 19 *Wend.* 534.   *St. John* v. *Van Santvoord,* 25 *Id.* 660.   8 *T. R.* 531.) IX. The only question for the jury, therefore, was, whether the treasure had been so delivered; and that question was submitted to them. Their verdict upon it is supported by sufficient evidence, and should not be disturbed.

*Theodore Romeyn,* for the defendants. I. The cause of action was not assignable, so as to enable the assignee to sue in his own name under the code, because, (1.) The action was for a *tort.* The plaintiff might have sued on the contract, if there was one, but elected to sue for breach of duty. On the judgment in such action the defendants might be imprisoned, and in other respects the actions are essentially different. (*Suydam* v. *Smith,* 7 *Hill,* 182.   *McDuffie* v. *Beddoe, Id.* 581.   *Burkle* v. *Ells,* 4 *How. Pr. R.* 286.) 2. The code forbids the assignment of a thing in action, not arising out of contract, so as to enable the assignee to sue in his own name. (§ 111.) This cause of action is not within the language of the code, for it does not rest on, nor arise from, contract, but from the violation of public duty. (*Hollister* v. *Nowlen,* 19 *Wend.* 239.) Here the assignment to the plaintiffs was *after* the breach of duty, and the failure to deliver

by the defendants. (*See Hall* v. *Robinson,* 2 *Coms.* 295; *Gardner* v. *Adams,* 12 *Wend.* 297.) The amendment of the code leaves *all* torts as at common law. By allowing this form of action, the right of the defendants to a set-off against the assignor would be defeated. (§ 112.) The plaintiff and his assignor might possibly have treated this cause of action as arising out of contract; but their selection of this form of action concludes them from now treating it as such. (*See Galloway* v. *Holmes,* 1 *Douglas' Mich. Rep.* 343, 4, *and cases there cited.*) II. The court erred in charging, as a matter of law, that the defendants were common carriers of gold dust and specie. (1.) The sole evidence of their business was derived from their advertisements, which the assignor of the plaintiff had seen. (9 *Barb.* 323.) (2.) By these advertisements they were described as express men and forwarders, and their business was described as forwarding. (3.) They are not liable as carriers, even although they may derive a profit from the transportation, if they have no interest *in the freight as such,* which must be assumed to be the case here, for the defendant offered to prove it. (4.) They are not made liable as carriers, by the fact that their *messenger* accompanied the goods. (*Hollister* v. *Nowlen,* 19 *Wend.* 234.) (5.) Forwarders and express men are liable also as carriers, only under the following circumstances: First. When they own the carrying lines. Second. When they own them in part, and undertake to *carry* beyond their own line for one *general* consideration, they are regarded as assuming the responsibility of common carriers for the entire distance. Third. If they undertake to carry to a certain point, in their own conveyances, and to merely forward beyond that point by other conveyances, they are not liable for such additional distance. Fourth. If they are not interested at all in the carrying lines, they are not responsible, although they may earn a profit through their freight; and this, whether the selected carriers were known to the owners or not. Much less shall they be held liable, when they publish the names of their carriers, and have not a particle of interest in the lines or freight. (6.) The steamship companies and the mule owners were the carriers in this case, and liable as such. The following

authorities are cited as sustaining the above propositions : (*Story on Bail.* § 502. *Angell on Common Carriers,* §§ 75, 98, 134, 466, 494. *Roberts* v. *Turner,* 12 *John.* 232. *Van Santvoord* v. *St. John,* 6 *Hill,* 157. *Fairchild* v. *Slocum,* 19 *Wend.* 329. *Wilcox* v. *Parmelee,* 3 *Sandf.* 610. 6 *Howard, U. S.* 344, 380.) (7.) Even if it were not perfectly clear, as a question of law, that the defendants were not carriers but express forwarders only, still it should have been left to the jury to decide, as a question of fact, under proper instructions, in which character they exhibited themselves to the public as contracting. (*Cowen & Hill's Notes, note* 957, *p.* 1420.) III. The court erred in instructing the jury, as a question of law, that Backus, the messenger of the defendants, was authorized to receive gold and gold dust on their account, to be carried by them and on their responsibility. (1.) He was not in fact so authorized. (2.) The advertisements did not so describe him. (3.) Whether he was held out to the world as such, so that a person using due diligence might be misled, was a question of fact for the jury. But the sole inquiry submitted was, *whether Spencer delivered the gold to him as the defendant's messenger,* not whether, under all the circumstances, he had a right so to regard him. Backus swears he did not so receive it in fact. 4. To justify this instruction, it should have appeared conclusively either that Backus had the right to receive packages for the company as this was received, or that he was held out to the public as having such authority. Now here Backus was not the carrier himself, nor a general agent, but a *special messenger,* a traveling agent, on the ship of another. The advertisements show that the company did not take *way freights,* but forwarded from California to New-York. That packages were to be received at a certain hour, and put up in a certain way, at their offices, and then such packages were sent under the care of a messenger. Whether, under these circumstances, a prudent man *was justifiable* in treating this special messenger as a general agent, should have been submitted to the jury, instead of the naked question, whether he did in fact so treat with him. (*Angell on Carriers,* §§ 129, 135, 136, 137, 76.) On the same grounds, a delivery to the carmen of the defendants

in the city would conclude them; or the delivery of money to a porter of the bank in the street, would bind the bank; or a delivery to a cook or steward of a steamboat, would make its owners liable for goods on freight.

BROWN, J. 1. The plaintiff's ability to maintain this action involves the question whether the right of action is assignable. The question is not affected by the provisions of the code; for as I shall attempt to show, presently, such choses and rights as were assignable before it took effect, are assignable still, and no others. Nor does it depend upon the question whether the right to maintain the action would have passed to the assignor's executors, in the event of his death, because the statute (2 *R. S.* 365, §§ 1 *and* 2) gives the personal representatives rights of action which, at the common law, died with the person. Mr. Justice Cowen, in *The People* v. *Tioga Com. Pleas,* (19 *Wend.* 76,) says: "I have not been able to find any case in England which, in respect to personal estate, has given the assignees a greater right than would go to the executor; none which vests in them a right of action for a personal tort or indeed any other mere tort, while there are several cases, in Pennsylvania, which deny that such rights will pass." In *Prosser* v. *Edmonds,* (1 *Younge & Coll.* 48,) I find Lord Abinger using this language: "In the course of the argument it was urged that an equitable as well as a legal interest may be the subject of a conveyance, and that the assignee of a chose in action may file a bill in equity to recover it, although he cannot proceed at law, for that purpose. But when an equitable interest is assigned, it appears to me that in order to give the assignee a *locus standi* in a court of equity, the party assigning that right must have some substantial possession, some capability of personal enjoyment, and not a mere legal right to overset a legal instrument. For instance, that a mortgagor who conveys his estate has in himself an equitable right to compel a reconveyance when the mortgage is paid, is true. But there is a right reserved to him by the original security: it is a right coupled with possession. and receipt of rent, and he is protected so long as the interest

Thurman *v.* Wells.

is paid, and it does not follow that the assignee of the mortgaged estate and the mortgagee may not adjust their rights without the intervention of a court of equity. In the present case it is impossible that the assignee can obtain any benefit from his security, except through the medium of the court. He purchase, nothing but a hostile right to bring parties into a court of equity as defendants to a bill for obtaining the fruits of his purchase. So when a person takes an assignment of a bond, he has the possession, and although a court of equity will permit him to file a bill on the bond, it does not follow that he is to go into a court of equity to enforce its payment. So other cases might be stated to show that where equity recognizes the assignment of an equitable interest, it is such an interest as is also recognized by third persons, and not merely by the parties insisting on them. What is this but the purchase of a mere right to recover? It is a rule, not of our law alone, but of all countries, that the mere right to purchase shall not give a man a right to legal remedies. The contrary doctrine is nowhere tolerated, and is against good policy. All our cases of maintenance and champerty are founded on the principle that no encouragement shall be given to litigation by the introduction of parties to enforce rights which others are not disposed to enforce." (*See also Story's Eq. Jur.* 1040.) *Gillet, receiver,* v. *Fairchild,* (4 *Denio,* 80,) was an action of trover for certain bonds theretofore owned by the banking incorporation of which the plaintiff was receiver. The opinion of the court establishes two things: 1. That the term choses in action includes " all rights to personal property not in possession, which may be enforced by action; whether the owner has been deprived of his property by the tortious acts of another, or by his breach of contract, express or implied." 2. That the statutes of the state having vested receivers of banks with power to sue for and recover "all the estate, debts and things in action belonging to or due to the bank," the plaintiff might maintain his action for the tort, although a mere assignee. This case does not help the plaintiff, because the right to sue, and maintain the suit in the particular case, is given by the statute. It seem to imply that without the aid of

the statute the action could not be maintained by the assignee. *Gardner* v. *Adams* (12 *Wend.* 297) denies the right of the assignee to take by assignment the right to sue for a tort. The action was trover for a bureau. The conversion took place before the assignment, and the court held the plaintiff could not recover. *Hall* v. *Robinson* (2 *Comst.* 293) was trover for a watch, and the plaintiff claimed by assignment after the delivery to the defendant. Both the judges who delivered opinions in the court of appeals were for affirming the judgment, upon the ground that the sale by the original owner to the plaintiff was a sale of the watch, and not of a mere right of action, saying that the conversion was after the sale and while the plaintiff was the owner. The opinions admit that if the conversion had been before the sale, the action must have failed. These authorities lead me to conclude that if the present action is for a tort or wrong done to the property of the assignor before the assignment, the action could not have been upheld before the code.

Let us now see what that statute has done to change the common law in this respect. Section 111 provides that " every action must be prosecuted in the name of the real party in interest, except as otherwise provided in section 113; but this section shall not be deemed to authorize the assignment of a thing in action not arising out of a contract." It will be recollected that the rights of assignees of choses in action which were the subject of assignment and transfer were originally recognized and protected in the courts of equity only. In more recent times, when they came to be recognized and enforced in the courts of common law, it was only by actions in the name of the original owner or assignor. When the distinction between proceedings at law and in equity was attempted to be taken away, and the distinction of actions was abolished, it became necessary for the purposes of harmony and uniformity to declare that actions should, except in some special and particular cases, be prosecuted in the name of the real parties in interest, as they always had been in the equity courts. Section 111 had no other object, that I can perceive, but to remove what would otherwise have been an incongruity, and to provide one uniform mode of

Thurman *v.* Wells.

bringing actions. The last clause of the section has no necessary connection with the first. It is not a limitation upon, or qualification of, the preceding part of the section, because that relates to the manner of bringing the suit, and not to the subject matter of the assignment. With or without the latter clause of the section, the law remains the same. ʿWhatever rights or choses were the subjects of assignment and transfer before the code, are so now ; and such as were not, remain now as they were then.

What then was it that the plaintiff purchased from Andrew G. Spencer by the deed of assignment under which he claims? It was not the coin and gold dust which he says was delivered to William H. Backus, the defendants' agent, to be carried from Panama to the city of New-York, because that was either lost or stolen at the island of Jamaica, long before the deed of assignment was executed. It was not a thing of which Spencer had delivered or could deliver the possession ; nor was it of any right which third persons could see and recognize. It was a mere right to recover against the defendants for a breach of duty, and a right to enter into the courts and litigate and enforce, if he could, a naked right or claim which Spencer was unwilling to, or could not, without the aid of his own testimony, litigate successfully and enforce himself. It was the right to recover for a tort ; for although this class of cases seem to lie at the point of separation between actions arising *ex delicto* and those arising *ex contractu*, and a plaintiff may waive the tort and proceed upon the contract, it is in vain to say the action arises out of contract, in the usual sense of the expression. "A common carrier exercises a public employment, and consequently has public duties to perform. He cannot, like a tradesman or mechanic, receive or reject a customer at pleasure, or charge any price he chooses to demand. If he refuses to receive a passenger, or carry goods, according to the course of his particular employment, without a sufficient excuse, he will be liable to an action ; and he can only demand a reasonable compensation for his services and the hazard he incurs. The extent of his liability does not depend upon the terms of the contract. It is declared by law. It is not the form of the contract, but the policy of the law, which determines

the extent of the carrier's liability." (*Hollister* v. *Nowlen*, 19 *Wend.* 239.)  " This action is founded on what is quite collateral to the contract, if any, and the terms of the contract, unless changing the duty of the common carrier, are in this case quite immaterial. The declaration states an obligation imposed upon him by the law. This is an action against a person who by an ancient law held as it were a public office and was bound to the public. This action is founded on the general obligation of the law." (*Ansell* v. *Waterhouse*, 2 *Chitty's R.* 1.)  "It appears from all the cases for 100 years back, that there are events for which the carrier is liable, independent of his contract. By the nature of his contract he is liable for all due care and diligence, and for any negligence he is suable on his contract. But there is a further degree of responsibility by the custom of the realm, that is, by the common law : a carrier is in the nature of an insurer." (*Forward* v. *Pittard*, 1 *T. R.* 27.)  Our courts have expressly decided that a common carrier cannot limit his liability by a public or private notice. This is the necessary result of the doctrine already stated. And whether it may be limited by express contract is a question not free from dispute and doubt. If (as we see) the carrier cannot refuse to receive goods for transportation; if he cannot limit the extent of his responsibility without the assent of his employer, or be entitled to demand what he deems a reasonable compensation for what he does ; if his responsibilities are fixed by considerations outside and independent of his contract, considerations of public policy, then the action arises not out of the contract, but is founded on the general obligations of the common law.

The complaint in this action is not framed upon the contract. It charges that the defendants are common carriers ; that Andrew Spencer, on the 16th of August, 1852, delivered the coin and gold dust at Panama to the defendants, as such common carriers, to be conveyed to the city of New-York, and then alleges the breach of duty as common carriers and the omission to convey and deliver the property, and sets out the assignment of the claim by Spencer to the plaintiff, on the first of November thereafter

I arrive at the conclusion that the right to institute and litigate this suit was not assignable, and that the plaintiff cannot maintain this action. We cannot overlook the fact that the assignor was the principal witness upon the trial, and it was mainly upon the strength of his evidence that the plaintiff had a verdict. We need not stop to speculate upon the motives of the parties to the assignment, or the objects they had in view, when it was executed. We behold its effect. It enabled the principal actor in the transaction to become a witness upon the trial and make out a case for a verdict. I think this cannot be done in cases where the thing assigned consists of a mere right of action for an unliquidated, unrecognized claim arising *ex delicto,* and of which there can be no possession and nothing resembling a possession, and no capability of enjoyment. If this class of claims are to be the subject of sale, assignment and transfer, so as to enable the assignees to institute suits in their own name, and call the assignors as witnesses to make out the causes of action, then have we entered upon a new epoch in the history of civil jurisprudence, and consequences will follow in the train of the late innovations which no good man can contemplate without dismay. I shall not give the practice my sanction, until its authority shall have been recognized and established by the judgment of the court of appeals.

2. I have looked into the printed notices and advertisements read in evidence upon the trial, without being able to find any thing which could induce dealers and those desiring to forward property, to believe that Backus, the express agent, had any authority to receive the coin and gold dust, for transportation, at points intermediate the places of departure and destination, and during the voyage. On the contrary, I find it stated up to what period of time of the day of the sailing of the packet, packages and property will be received for carriage. In the advertisement taken from the San Francisco Daily Whig, the time is given, up to which treasure will be received. It was, I think, a fair and legitimate inquiry for the jury, what authority Backus, the agent, had to bind his principals by the receipt of treasure

after the commencement of the voyage. At folio 110 of the case, it appears an inquiry was put to the witness Backus, with a view to furnish evidence on that point. It was objected to, and overruled. Now, if it was rejected because it contradicted any thing in the published advertisements, then I have not been able to find in what the contradiction consisted. If it was overruled because of the general obligation of common carriers to receive and transport property, then it must be remembered that the obligation must correspond with the nature of their employment ; and if they are carriers of certain kinds of property, from one given place to another, they cannot be compelled, against their will, to become carriers from intermediate places. As the delivery of the coin and dust was to their agent, and not to the defendants themselves, his right to receive it at the place where it is said to have been put into his hands, and thus charge his principals with its security and safe delivery, became a pertinent and important inquiry upon the trial. I think the judge erred in rejecting the evidence upon the question of the agent's authority to receive the treasure after he left San Francisco, and during the continuance of the voyage.

The court charged the jury that Backus, as the messenger of the defendants, was authorized to receive gold and gold dust on their account, to be carried by them on their responsibility. This was excepted to by the counsel for the defendants. Its effect was to preclude all inquiry by the jury upon what I deem to be the principal question in the cause. All that the charge left them to determine was, whether the treasure was delivered to Backus as a private person, to be carried by him on his own account, or as the agent and messenger of the defendants. This instruction was entirely too narrow. It concluded the defendants upon one of the main issues in litigation. I see nothing in the law which distinguishes between the agents of common carriers and the agents of others. If the act upon which the defendants are to be charged is the act of an agent, his authority must be made out, and is a question of fact for the jury.

There must be a new trial, with costs to abide the event.

S. B. Strong, J.   The complaint in this action is against the defendants as alleged common carriers, for a breach of duty. There is no allegation of the violation of any contract, nor is any contract set forth.   Possibly one might be implied, from the averment that the defendants were to convey the goods for a certain reasonable reward; but the plaintiff's claim is founded upon a responsibility independent of, and beyond, the contract. (*Forward* v. *Pittard,* 1 *D. & E.* 27.)   It was said by Judge Bronson in *Hollister* v. *Nowlen,* (19 *Wend.* 239,) that " the extent of the liability of a common carrier does not depend upon the terms of his contract ; it is declared by law." " It is not the form of the contract, but the policy of the law, which determines the extent of the carrier's liability."   In *Ansell* v. *Waterhouse,* (2 *Chitty's R.* 1,) Holroyd, J. said, " this action" (which was on the case, against the proprietor of a stage coach) " is founded on what is quite collateral to the contract, if any, and the terms of the contract, unless changing the duty of a common carrier, are in this case quite immaterial.   *The declaration states an obligation imposed upon him by law."*   An action can undoubtedly be founded upon the contract, but then the plaintiff must prove his contract as stated in his complaint, and his recovery must be based upon that, should he recover at all, but it is not so in declaring for a tort : so that, as was said by Judge Cowen in *Weed* v. *The Saratoga and Schenectady Railroad Company,* (19 *Wend.* 541,) when the case is at all doubtful, or embarrassed even, as to subject matter, the action should, if the plaintiff would secure himself from injury by variance, be for the tort.   The action, in the case under consideration, is instituted by an assignee.   It is in form and substance for " a thing not arising out of contract."   It is for a breach of duty.   One of the sources of such duty may have been a contract, but another and the principal source is the obligation imposed by law, by reason of the nature of the employment.   The cause of action *as instituted* could not be assigned at common law so as to confer upon the assignee a right to maintain a suit for it in his own name.   Neither can it under the code.   (§ 111.)   It is true the assignment purports to be of the goods as well as of the cause

of action by reason of their loss.   Possibly an action in the nature of the *ancient* suit of trover for the *conversion* of the goods might have been sustained by the transferee in his own name, according to the principle laid down by one of the judges in *Hall* v. *Robinson*, (2 *Comst.* 295.)   The point was not necessary to the decision of that case, however, and I very much doubt the correctness of the position taken by that learned judge.   It was opposed to the decision of the supreme court in the case of *Gardner* v. *Adams*, (12 *Wend.* 297.)   But the action in this case does not purport to be by the owner of the goods, for their conversion.   The plaintiff alleges that he is the owner of the *claim* and demand resulting from the entire loss of the goods through the neglect of the defendants, and seeks to recover in that capacity.

The defect is not, as was supposed by the plaintiff's counsel, merely of a party plaintiff, such as is mentioned in the 4th subdivision of the 144th section of the code.   The provision has reference to the number—where there are too many or not all who should be joined.   The difficulty here is that the complaint does not state facts sufficient to constitute a cause of action.   No action can be sustained by the plaintiff, under the facts which it avers.   The objection being substantially that the complaint does not state facts sufficient to constitute a cause of action, was not waived by the defendants by their omission to demur or to urge it in their answer.   (*Code*, § 148.)   The provision of the code to which I allude, has reference to a cause of action *in the plaintiff*.   It is not enough to raise the presumption of a waiver that the complaint sets forth facts sufficient to constitute a cause of action in favor of some other person.   I am satisfied that the plaintiff cannot sustain this action.

But there are other, and it seems to me insuperable, difficulties in the plaintiff's way.   It does not appear that the messenger who received the goods was the agent of the defendants, to enter into any engagement for the transportation of property, or to take charge of any, *except such* as was confided to him by them, or some one duly authorized to do so in their behalf.   Their advertisement, which was given in evidence by the plaintiff, simply

says that a faithful special messenger is sent in *charge* of each express *to* destination. This says nothing of any authority to engage for, or receive, freight. The messenger is sent in charge of the express to its destination. The advertisement mentions the appointment of "*principal* agents in California." This would seem to indicate that the contracts for freight were to be made by them, and not by the messenger. The designation of "messenger" does not of itself indicate any authority to make contracts ; nor does the annunciation that he is to take charge of the express-*to* destination. If the messenger had the requisite authority it should have been proved, either expressly or impliedly, from his conduct as sanctioned by the defendants. When one employs another in the capacity of agent without inspecting his warrant or inquiring into his acts in that capacity, he does so at his peril. The alleged principal is not responsible except upon an actual delegation of power, or one implied from the characteristic designation of the agent, or the sanctioning of his conduct, implying the nature of his authority. In this case there is nothing to prove that the messenger was authorized by the defendants to take freight in their behalf. The messenger swears that he had no authority to take the goods on freight, and that he told Spencer, when he delivered the goods to him, that there was no agent there to receive any thing for the defendants. If the messenger is to be believed, he not only had no right to receive the goods in behalf of the defendants, but he apprised Spencer of his want of the requisite authority. Spencer probably intended to contradict this when he says that Backus did not explain to him that he had no charge of the specie. Spencer and Backus no doubt testify under a strong bias. There is nothing else to impeach the credit of Backus. He is not expressly contradicted as to any material allegation. Captain Reynolds testifies that Backus said the company was not responsible, because there had been no receipt given, but Mr. Farnham, who was present at the same time, says, that he has some little doubt whether Backus made the reply about the receipt. As to Mr. Spencer, the account which he gives of himself does not entitle him to full credit. A professed gambler may be a reliable witness, but the pre-

sumption is rather against him. My impressions on the point which I am now considering are, that the defendants' advertisement does not indicate or imply any power in the messenger to receive in their behalf goods on freight; that he had not in fact such power, and that he so informed Spencer.

But I am well satisfied that if Backus, the messenger, had the requisite authority to receive the property on freight in behalf of the defendants, he did not so receive it, but that he took it on his own responsibility. He testified that Spencer asked him if *he* had a trunk in which Spencer could put the dust and coin, to go on shore ; that Backus told Spencer that he could put the goods in his (Backus') trunk ; that Spencer put the goods into Backus' private trunk, in which there was nothing but his own private apparel ; that Spencer asked Backus to let it remain in that trunk, going across the isthmus ; that Backus made no agreement to receive the property for the defendants ; was not asked to receive it for them, and did not receive it for them ; that Spencer, after the goods were lost, said he had no claim on the defendants, and that when Backus was subsequently informed that Spencer intended to sue the defendants, he told Spencer that if the defendants had to pay him, he, Backus, would pay them, for it was money he had taken for his accommodation, and not on their account. Spencer, on his primary direct examination and cross-examination, in giving an account of the transaction, speaks of his negotiation with Backus as a personal affair, and does not allege that it was in his capacity of agent for the defendants. On his cross-examination he says that he spoke to Backus as an agent of the defendants, and not individually. This may have reference to intentions, and not as to what was said. It would have been more satisfactory if the witness had stated the particulars, or at any rate so far as to have shown that Backus must have understood that the goods were confided to him as the agent of the defendants. Spencer testifies under circumstances detracting somewhat from his credibility. He had transferred a disputed claim—one probably known by the assignee to be contested, and yet, according to Spencer's testimony, he received it in full satisfaction of a

Thurman *v.* Wells.

just debt, and discharged the assignor from all further liability. The assignment of a disputed claim, with such an understanding, followed by the immediate institution of a suit in which the assignor is the only material witness to support the claim, is always a suspicious affair ; and in such cases I deem it a duty to instruct the jury to receive the evidence with great caution.   In such cases, too, it frequently happens that although there is a nominal conveyance discharging the assignor from all liability, there is a secret understanding that the assignee shall not eventually lose by the transaction.   So far as relates to the credibility of Backus, he had undoubtedly a bias in favor of the defendants ; but if, as is alleged, the goods were lost through his carelessness, he was responsible either directly to the plaintiff or eventually to the defendants, so that there was no actual preponderance either way.   Still I should not feel inclined to disturb the verdict of a jury founded on their *presumed* belief of either of those witnesses, in the absence of other testimony. But here the credibility of Backus, and the presumption that he has given a truthful account of the affair, are strongly fortified by the testimony of other and, as it would seem, credible and disinterested witnesses.   Edwin L. Stone testifies that he saw Spencer *immediately after* the loss of his treasures ; that Spencer then told him that he had no right to look to the defendants for the amount of his loss, as Mr. Backus had taken his money as one friend would take money for another ; that he had asked Mr. Backus to let him put the money in his trunk, and Mr. Backus had assented.   He said that he, Spencer, had put it entirely at his own risk ; and that after leaving Kingston this witness had frequently heard Spencer say that he had no claim whatever against the defendants ; that his only expectation was from the police in New-York to discover the thief on board the vessel ; and he repeated that Mr. Backus had taken the money to accommodate him.   Henry Seaman testified that he had heard Backus say, on the passage from Kingston to New-York, that he had asked Mr. Backus to let him put it (the property in question) in Mr. Backus' trunk, at Panama, and that it had remained in the trunk until it was taken out at Kingston ; that he should not

hold Backus responsible, nor should he loose by the transaction; that the company (meaning the defendants) should know nothing about it; that the trunk in which Backus had put Spencer's money was not one of the defendants' trunks, but was his (Backus') trunk. The testimony of these witnesses, if they are to be believed, is decisive against the *interested* account of the transaction, given by Spencer, and corroborates the version of the affair given by Backus.

The verdict of the jury, finding in effect that the goods were entrusted to Backus in his capacity of agent for the defendants, is decidedly against the preponderance of the evidence.

In the view which I take of this case it is unnecessary to decide whether the defendants are common carriers; and that question has become so important, that it should be settled only in a case where it solely *controls the controversy.*

There should be a new trial; costs to abide the event of the suit.

ROCKWELL, J., concurred.

New trial granted.

[KINGS GENERAL TERM, October 3, 1854. *Brown, S. B. Strong* and *Rockwell,* Justices.]