City of St. Louis and County of St. Louis v. J. H. Alexander.

CITY OF ST. LOUIS & COUNTY OF ST. LOUIS, Appellants, v. J. H. ALEXANDER & OTHERS, Respondents.

1. An act of the general assembly entitled " An act to reduce the law incorporating the city of St. Louis, and the several acts amendatory thereof, into one act, and to amend the same," approved February 8, 1843, contained the following provision: " The city shall not, at any time, become a subscriber for any stock in any corporation." By a special act, approved March 1, 1851, enacted while the above general prohibition was in force, the city was authorized to subscribe to the stock of the Ohio and Mississippi railroad company, any amount not exceeding the sum of $500,000. An amended city charter, also entitled " An act to reduce the law incorporating the city of St. Louis, and the several acts amendatory thereof, into one act, and to amend the same," approved March 3, 1851, contained the provision, above set forth, that " the city shall not, at any time, become a subscriber for any stock in any corporation" (Art. VII, § 13, Sess. Acts, 1851, p. 168); and also the following (see Art. VII, § 25), that " all acts and parts of acts contrary to and inconsistent with the provisions of this act, or within the purview thereof, &c., are hereby repealed." These several acts took effect from their passage. Held, that the act of March 3, 1851, did not repeal the special enabling act of March 1, 1851, and that a subscription under the act of March 1, 1851, to the stock of the Ohio and

Mississippi railroad company, made by the city of St. Louis, was authorized by law and valid, and that the city thereby became a legal stockholder in said company.

2. The county of St. Louis, by an act of the general assembly, approved January 26th, 1853, was authorized to subscribe the sum of $200,000 to the capital stock of the Ohio and Mississippi railroad company. Said act also contained the following provision : " Before the subscription hereby authorized shall be made, the county court of the county of St. Louis shall submit the question of making said subscription to the qualified voters of said county ; and if a majority of those voting shall be in favor of such subscription, the county court shall at once proceed to make the same for the county." *Held*, 1st, that this act, under the general law (see R. C. 1845, p. 695), took effect ninety days after its passage, a different time not being appointed therein ; 2d, that the provision requiring the county court to submit the question of making the subscription to the qualified voters of the county is not merely directory, but that it would be illegal for the county court to make the subscription without first submitting the question of making the subscription to the voters of the county as required in the act; 3d, that the act must be in force before the question of making the subscription can be lawfully admitted to the qualified voters of the county ; 4th, that the provision requiring the question of making the subscription to be submitted to the voters of the county was constitutional.

3. Upon the dissolution of an injunction restraining the sale, under a deed of trust, of the property, effects, franchises, &c., belonging to a railroad company, it is erroneous for the court, without proof, to assess the damages at six per cent. upon the amount released by the dissolution : the damages assessed in such a case should be commensurate with the actual injury sustained, and may, if the circumstances warrant it, exceed ten per cent. upon the amount enjoined.

## *Appeal from St. Louis Court of Common Pleas.*

This was a petition for an injunction by the city of St. Louis and the county of St. Louis " for themselves and such other stockholders of the Ohio and Mississippi railroad company as may voluntarily become parties plaintiff hereto." The defendants were Joshua H. Alexander, Daniel D. Page, Henry D. Bacon, Thomas Brown, Edward Wyman, The Ohio and Mississippi Railroad Company, Daniel R. Garrison, William H. Belcher, Samuel Gaty.

The petition sets forth substantially that the Ohio and Mississippi railroad company was incorporated by the legislature

of the state of Illinois on the 12th of February, 1851 ; that by said act of incorporation said company was empowered to borrow money for the purpose of completing and furnishing or operating their railroad, and " to mortgage their corporate property and franchises, or convey the same by deed of trust to secure the payment of any debt contracted for the purpose" of completing, &c., said railroad ; that " it was further enacted by said act of incorporation, that all the corporate powers of said company should be vested in and exercised by a board of directors, to consist of not less than seven nor more than seventeen in number, and such other officers, as agents and servants, as they should appoint ;" that by an act of the general assembly, approved March 1st, 1851, the city of St. Louis was authorized to subscribe to the stock of the Ohio and Mississippi railroad company any amount not exceeding the sum of $500,000 ; that by act of the general assembly, approved January 26th, 1853, the county of St. Louis was authorized to subscribe to the stock of the Ohio and Mississippi railroad company the sum of $200,000 ; that the city of St. Louis did subscribe to the stock of said railroad company the sum of $500,000, and issued its bonds for that amount; that the county of St. Louis subscribed $200,000, and issued its bonds for that amount ; " that on the 5th day of June, in the year 1855, certain persons claiming to act on behalf of the Ohio and Mississippi railroad company, did set their hands and seals and the seal of said company to an instrument of writing, purporting to be a deed of trust of that date, executed by the Ohio and Mississippi railroad company of the first part, Joshua H. Alexander of the second part, and Page & Bacon of the third part, which instrument of writing purported to convey to the said Alexander all the real estate, right, title, interest, claim and demand of said company of, in and to any real estate in the state of Illinois, which had been or might hereafter be acquired by said company, for and towards the construction of the railroad which said company is by its act of incorporation authorized to construct in the said state of Illinois, and for and

towards the const uction of the engine-houses, car-houses, depots and other tenem nts, or for any other purpose connected with said road; and all the t nements, road tracks, rails, bridges, and other fixtures whatever, which might be placed or construct ᵈ by said company, or any real estaᵗe which might be owned, held, used or occupied by it; and all engines, locomotives, tenders, cars, machinery, and all other property of whatsoever kind which were then or thereafter might be owned by said company; and all tolls, income, revenue, issues and profits of the property thereby conveyed; and all privileges, franchises, easements, rights and interests whatsoever, then possessed, used or enjoyed, or which might thereafter be acquired or possessed by said company;—in trust, however, for the following purposes: Whereas the said company had become indebted to Page & Bacon, on account of the construction and equipment of said road, in the sum of $1,158,484 61; and whereas the said company did, by a resolution duly entered on their records, authorize to be executed to the said Page & Bacon, the promissory note of the said Ohio and Mississippi railroad company, bearing even date with said deed of trust, and payable five days after date thereof, for the sum of $1,158,-484 61, with interest from date; and whereas the said board of directors did at the same time, to-wit, the 5th day of June, 1850, further order that the payment of said note should be secured to the said Page & Bacon by a deed of trust, to be executed by Daniel R. Garrison, vice-president, on behalf of said company, upon its said road and the other property, rights, privileges and effects hereinbefore conveyed, which said deed of trust should be a lien upon sᵃid road and other property, rights, privileges and effects of said company, under which authority and for which purpose said deed of trust was executed; if said note, with the interest thereon, should be paid by said company at or before the time the same was made payable, then said deed should be void; but if default should be made in the payment of said note and interest, then the said trustee or his successors in office, to be appointed as in said deed was after-

wards provided, should have full power, when notified in writing of such default by said Page & Bacon or their assigns, and thereunto required in writing by said Page & Bacon or assigns, to enter into and upon, and take possession of said premises in said deed conveyed in person or by his agent, and receive the income, earnings, issues and profts and proceeds thereof for the accomplishm nt of the objects and purpose of said deed, and that said trustee should appropriate said income and earnings, issues and profits and proceeds, first, to the payment of the necessary expenses of keeping said road, and the engines, locomotives, tenders, cars and other appurtenances thereof in repair, and of conducting the business of said road in a full and efficient manner; and the surplus, if any there should be, should be paid from time to time to the said Page & Bacon or assigns, on account of the said note, until the same should be fully paid and discharged, when the premises should be redelivered to said company or its legal representatives;— and in and by said instrument of writing it was further provided that said trustee and his successors should have power, as might be needed to satisfy said note, to sell and dispose of said premises, in whole or in part, upon the request in writing of said Page & Bacon or assigns, at public auction, for cash; and upon such sale to deliver to the purchaser or purchasers possession of the property sold, and to execute to him or them all needful and fit deeds of conveyance necessary to vest in such purchaser or purchasers a complete title to the premises and to receive the purchase money, out of which should be paid, first, the costs and expenses of such sale, and next whatsoever might be due to the said Page & Bacon on account of said note, and the remainder, if any, should be paid to the said company or its legal representatives, which sale should be after twenty days' public notice in one or more newspapers printed and published in the city of St. Louis, state of Missouri, and such sale should be held at the court-house door, in the city of St. Louis," &c.

Plaintiffs further state that " the said Joshua H. Alexander,

assuming to act under and by virtue of the said instrument of writing, did enter upon and take possession of the said railroad, its stock and appurtenances, and has ever since the 15th day of June, 1855, assumed to control and manage the affairs thereof, receiving the income, avails and profits of said railroad; and on the 19th day of July, 1855, the said Joshua H. Alexander, assuming and purporting to act by virtue of the written request of the said Page & Bacon, has, by advertisements published in the St. Louis Intelligencer, a newspaper published and printed in the city of St. Louis, given notice that on the 8th day of August, 1855, he will proceed to sell the said railroad and appurtenances at public auction, to the highest bidder, for cash, at the court-house door of St. Louis county, all of which the said Joshua H. Alexander claims to do by virtue of the powers supposed to be on him conferred by said instrument of writing, purporting to be a deed of trust executed by the Ohio and Mississippi railroad company, and plaintiffs herewith file a copy of said advertisement, and refer to the same for greater certainty.

"The plaintiffs say that the said instrument of writing, purporting to be a deed of trust, executed by the Ohio and Mississippi railroad company to Joshua H. Alexander, trustee of Page & Bacon, dated June 5th, 1855, is not the deed of the said Ohio and Mississippi railroad company; that the resolution recited in said instrument of writing, purporting to have been adopted by the directors of said railroad company, on the 5th June, 1856, is not a valid, legal and binding act of the said Ohio and Mississippi railroad company, but an unauthorized act of a portion of the directors of the said company, too few to exercise corporate powers under the charter of said company, and not even sufficient to satisfy the requirements of one of the by-laws of said company, conceding to that by-law the character of a lawful rule of action, which these plaintiffs expressly deny to it. The by-law to which reference is made is in the following terms, to-wit: '§ 3. Four directors shall constitute a quorum, and shall be competent to transact busi-

ness, except in cases where the construction and location of the road is involved, when it shall require seven to form a quorum. In case of the absence or inability of the president, the board may elect a president *pro tem.*, who shall perform all the duties of the office during the absence or inability of the president.' The plaintiffs say that this by-law is inoperative and void, as being in conflict with the 6th section of the charter of incorporation of said railroad company hereinbefore quoted, which declares that ' All the corporate powers of said company shall be vested in and exercised by a board of directors, to consist of not less than seven nor more than seventeen in number, and such other officers, agents and servants as they shall appoint.' Besides the conflict of this by-law with the express provisions of the charter of said company, (and said plaintiffs here produce and show to the court a copy of said charter and the amendment thereof, and pray that the same be taken as an exhibit to this petition,) the plaintiffs say that at the meeting whereat the said resolution recited in said instrument of writing was adopted, there were only four persons present who claimed to be and represented themselves as the directors of said company, to-wit, Henry D. Bacon, Daniel R. Garrison, Joshua H. Alexander, and William H. Belcher ; that of these four persons, one was, by the terms of the said instrument of writing, the beneficiary thereof, or one of the persons for whose use and advantage the said instrument of writing was made ; and another one of said persons, assuming to be directors of said company on that occasion, was the individual to whom, according to the terms of said instrument of writing, the legal estate in and to the property and effects embraced and described therein would pass thereby, which two persons so referred to were Henry D. Bacon and Joshua H. Alexander, and so the said plaintiffs say that the said meeting of said directors of said company was held only by two competent and legal directors at most, admitting the said Daniel R. Garrison and William H. Belcher to be lawful directors of said company. But these plaintiffs have reason to believe, and do believe, and so charge

the fact to be, that the said four persons, Henry D. Bacon, Joshua H. Alexander, Daniel R. Garrison and William H. Belcher, were not, nor was any of them named as directors of said company in th' act of incorpo ation, and the said plaintiffs charge that some of said four pers: ns have not been elected at the annual election of directo s of said company, as prescribed by the charter thereof, nor in any other manner prescribed by the charter. But the said plaintiffs say that they are unable to state the particulars of the election of directors by said company, for the reason that access to the books and records of said company has been refused by the secretary of said company, although a special request to be allowed to see them was made on the first day of August, 1855, at the office of the said company, at St. Louis, Missouri, which request was made on the pant of the plain iffs.

" And said plaintiffs say that the said instrument of writing is not the deed of said Ohio and Mississippi Railroad Company, nor in anywise binding on that corporation or the stockholders thereof ; that the said Henry D. Bacon, Joshua H. Alexander, Daniel R. Garrison and William H. Belcher, in assuming to execute the same on the part and in the name of said company, were guilty of an assumption of authority and a betrayal of trust ; that the object and scope of the said parties, who combined to personate the said company in the making of said instrument of writing, was to defraud the stockholders of said Ohio and Mississippi Railroad Company, to confer on the said Page & Bacon and their servants the exclusive control and ownership of said road to the exclusion of all other creditors and stockholders thereof ; and that the said Henry D. Bacon, Daniel R. Garrison, William H. Belcher and Joshua H. Alexander possessed no power so to misapply and misappropriate the property, effects and franchises of said company to their own use or to the use of any of them ; and that it is not competent for the directors of said company to make such a deed or instrument of writing as that under which the said Joshua H. Alexander now assumes to act. And said plaintiffs

further say that said note in said instrument of writing described and set forth, is not the note of said company, nor in anywise binding on the said company; and said plaintiffs further say that they have reason to believe and do believe, and therefore so charge, that the said Ohio and Mississippi Railroad Company was not on the 5th day of June, 1855, indebted to the said Page & Bacon in the said sum of $1,158,484 61, nor, as they believe, in any sum at all approaching to that amount; that they have asked for information which might enable them to ascertain the actual state of accounts between the said Page & Bacon, on the one hand, and the Ohio and Mississippi Railroad Company on the other hand; but answers to their questions have been refused by the said Henry D. Bacon (who is also president of the Ohio and Mississippi Railroad Company,) and by the secretary of that company, acting under the directions of said Henry D. Bacon, so that said plaintiffs have only very meagre and imperfect means of stating or knowing the actual relations existing between said Page & Bacon and said railroad company, and whether the said Page & Bacon are creditors or debtors of said railroad company, and if creditors or debtors, then in what sum of money; and the plaintiffs have good reason to believe and do believe, that any inquiry of a searching nature into the true history and conditions of the relations existing between the said Page & Bacon (which firm is now composed of Daniel D. Page, Henry D. Bacon, Thomas Brown and Edward Wyman, and has from the beginning been composed of at least Daniel D. Page and Henry D. Bacon,) and the said Ohio and Mississippi Railroad Company is systematically and anxiously avoided by said Henry D. Bacon, who, in his manifold capacity of banker, financial agent, contractor, stockholder and president of the said Ohio and Mississippi Railroad Company, on the one part, and member of the firm of Page & Bacon, on the other part, is able to exercise, and does exercise, and has exercised fraudulently a potent influence in controlling not only the mode in which the affairs of said company shall be managed, but also the degree of publicity which shall be given

to the manner in which the agents, ministers and servants of the stockholders of said railroad company may acquit or have acquitted themselves of the trusts to them confided; and plaintiffs say that the said Bacon and the said Belcher, Alexander and Garrison, instead of giving to them the information they have sought heretofore and now seek, relative to the accounts between the said Page & Bacon, on the one hand, and the said Ohio and Mississippi Railroad Company, on the other hand, treat all such applications for information with pertness and insolence, returning abusive answers to respectful communications, and deporting themselves towards the stockholders of said Ohio and Mississippi Railroad Company as if it were the greatest presumption on the part of said stockholders to have any curiosity as to the manner in which their money and property was being managed or mismanaged; as if any distrust felt or any anxiety shown by said stockholders, when informed of the approaching sale and absolute disposition of all their property and effects in said road to satisfy a claim, into the existence or correctness of which they had been forbidden to pry, was a personal wrong and injury to them, the said Bacon, Belcher, Garrison and Alexander, not only justifying them in the use of discourteous language and behavior towards the stockholders, but also releasing them, the said Bacon, Belcher, Garrison and Alexander, from the trusts incident to the office of directors of said company, in which office said Bacon, Belcher, Garrison and Alexander nevertheless assume to act; and said plaintiffs say that, from the best and most reliable sources of information within their control, and to them accessible, they believe and so do charge the fact to be, that the said Ohio and Mississippi Railroad Company were not indebted on the 5th day of June, in the year 1855, to the said Page & Bacon in a sum exceeding $500,-000. The plaintiffs do not mean to admit and expressly disclaim any admission that the said Ohio and Mississippi Railroad Company was on the day and year last aforesaid indebted to the said firm of Page & Bacon in the said sum of $500,000. They require proof of any indebtedness whatever on the part of

the said Ohio and Mississippi Railroad Company to the said Page & Bacon, and protest against any admission of the four directors above named being taken as evidence of the fact of such indebtedness, and they refer to the account for which they pray hereafter in this petition for the ascertainment, judicially, of those facts, information touching which has been heretofore constantly refused by those who are entrusted temporarily with the care and direction of said road, when these plaintiffs have, in their capacity as stockholders, sought to obtain such information; and plaintiffs say that the Ohio and Mississippi Railroad Company had no power or right to make such a note as is set forth and described in the said instrument of writing, dated June 5, 1855, and that said Henry D. Bacon, Daniel R. Garrison, Joshua H. Alexander and William H. Belcher were not competent to act for the said Ohio and Mississippi Railroad Company by any such resolution, note or instrument, as those which have been in this petition referred to and described; that the office conferred or sought to be conferred on the said Joshua H. Alexander, by said instrument of writing, was not merely a naked trust, but an office of profit and emolument; that the said Henry D. Bacon voted on the adoption of said resolution, and also the said Joshua H. Alexander, and that the whole of said actings and doings were a corrupt combination on the part of said Bacon, Alexander, Garrison and Belcher, to give to said Bacon (together with his partners, Daniel D. Page, Thomas Brown, and Edward Wyman) the full and complete control of the said railroad and its appurtenances, to enable them to defeat the rights and security of all other than lien creditors, and to enable them to dictate terms at their discretion to the other stockholders of said railroad; and said plaintiffs say that, in convening on the said 5th day of June, 1855, and assuming to act on behalf of the said Ohio and Mississippi Railroad Company, the said Bacon, Alexander, Garrison and Belcher were guilty of a gross breach of duty towards the said Ohio and Mississippi Railroad Company, and a fraud towards the stockholders thereof, and were combined and confederated to defraud the said

32—VOL. XXIII.

stockholders, and particularly the City and County of St. Louis, by pretending to audit and allow in favor of said Page & Bacon against said Ohio and Mississippi Railroad Company a debt greatly exceeding any thing by the said Ohio and Mississippi Railroad Company to the said Page & Bacon due and owing, and by assuming to place in the hands and control of an agent and confederate of said Page & Bacon, the entire possession, management and control of said railroad, its property and franchises, to the exclusion of all other creditors (except such as were already protected by lien), and with the imputed power of sacrificing and destroying all the interests and property of the stockholders of said road, unless a condition, which at the time of naming it the said confederates well knew to be impossible, was complied with; and these plaintiffs say that on the said 5th day of June, 1855, the board of directors of said railroad company consisted of at least nine members, and these plaintiffs believe that it consisted of ten members, (but in the darkened condition in which it is the pleasure of said Bacon, Alexander and others to leave them in respect to the affairs of said company, they find it impossible to speak with accuracy,) and so there was not at such meeting on 5th of June, 1855, a majority or legal quorum of said board of directors of said company.

"Plaintiffs say that they are informed and believe, and so charge, that the said four persons, to-wit, Henry D. Bacon, Joshua H. Alexander, Daniel R. Garrison and William H. Belcher, after having combined and confederated as aforesaid to pass the aforesaid resolutions and execute the aforementioned instrument of writing, purporting to be the deed of the said Ohio and Mississippi Railroad Company, for the purpose of defrauding the stockholders thereof, and in particular the plaintiffs in this suit, became doubtful and anxious as to the form in which their said fraudulent purpose had been sought to be effected, and, for the purpose of giving color to the said contrivance and usurpation of power and authority of which the said Henry D. Bacon, Joshua H. Alexander, Daniel R. Garrison and William

H. Belcher had been guilty, they, the said Henry D. Bacon, Joshua H. Alexander, Daniel R. Garrison and William H. Belcher, did convene a meeting of directors of said company on or about the —— day of June, 1855, consisting of said three persons, to-wit, Alexander, Garrison and Belcher, and also of Alfred Kitchell, Samuel Gaty and Sidney Breese, and did procure, according to the best knowledge and information of these plaintiffs, a vote of said directors, to-wit, the said Alexander, Garrison and Belcher, Kitchell, Gaty and Breese, or a majority of them, professing to ratify and confirm all that had been done as aforesaid by the said Henry D. Bacon, Joshua H. Alexander, Daniel R. Garrison and William H. Belcher, on the 5th day of June, 1855. The said plaintiffs say that at the said meeting of directors whereat was adopted the said resolution professing to ratify the said action of the said Henry D. Bacon, Joshua H. Alexander, Daniel R. Garrison and William H. Belcher, on the 5th day of June, 1855, there were present the said Joshua H. Alexander, Daniel R. Garrison, William H. Belcher, Samuel Gaty, Alfred Kitchell and Sydney Breese, and, as far as these plaintiffs can understand and learn, no other person or persons ; that of these persons, the said Alexander, Belcher and Garrison were in their efforts to convene the said meeting, and to procure the said vote, merely carrying out and continuing the original fraud, of which the said Bacon, Alexander, Belcher and Garrison had been in the first instance guilty on the 5th day of June, 1855, as aforesaid; and the other directors who voted in favor of the said resolution, purporting to ratify and approve of all that had been done by the said Henry D. Bacon, Daniel R. Garrison, Joshua H. Alexander and William H. Belcher on the 5th day of June, in the year eighteen hundred and fifty-five, were on the day of the passage of the resolution of ratification either cognizant of the fraud and fraudulent designs of the said Henry D. Bacon, Joshua H. Alexander, Daniel R. Garrison and Wm. H. Belcher in that behalf, or were imposed on or deceived and led into error and mistake by the misstatements and misrepresentations of the

said Henry D. Bacon, Joshua H. Alexander, William H. Belcher and Daniel R. Garrison, touching the condition of the accounts between said Page & Bacon and the said Ohio and Mississippi Railroad Company ; and so these plaintiffs say that all the acts and doings bearing date on the 5th day of June, 1855, were and are illegal and void, by reason of the fraud of said Henry D. Bacon, Joshua H. Alexander, Daniel R. Garrison and William H. Belcher, and the irregularities hereinbefore detailed and set forth ; and that any resolutions afterwards adopted by an increased number of said directors of said railroad company were all void, for the reason that the vote on such resolution was obtained by the fraud of the said Henry D. Bacon, Joshua H. Alexander, William H. Belcher and Daniel R. Garrison, and the fraud or mistake of the said Alfred Kitchell, Samuel Gaty and Sydney Breese, who were led into said mistake, if mistaken, by the fraudulent representations of said Bacon, Alexander, Garrison and Belcher, as hereinbefore stated. And the plaintiffs say that they are unable to give with precision the details of the action of the said directors at said last meeting, because access to the books of said corporation has been denied them by the secretary and agent of the said company, and they do not know, except from information, that there was any such meeting of directors for the purpose of passing a resolution purporting to ratify the acts and doings of the said Bacon, Alexander, Belcher and Garrison on the 5th day of June, 1855 ; but they are informed and believe, and do charge, that such a meeting of said directors was convened by the said Joshua H. Alexander, Daniel R. Garrison and William H. Belcher, and that such a vote of said directors was obtained by such means and appliances as are above stated.

" And said plaintiffs say that, although the said instrument of writing and the resolutions of 5th day of June, 1855, are, as they verily believe, void in consequence of the fraud, illegality and irregularity of the said directors, yet that irreparable mischief would result from the sale of the said property in said instrument of writing described, at public auction, as contem-

plated by said advertisement, and that it would be difficult, if not impossible, for the stockholders to avail themselves, as against-an innocent purchaser, of many of the points of defence against said instrument of writing suggested and indicated in this petition.

" And said plaintiffs are informed that it is in contemplation by the said Henry D. Bacon, Joshua H. Alexander, William H. Belcher and Daniel R. Garrison and others, claiming to be directors of said Ohio and Mississippi Railroad Company, to issue the obligations of said company and pass them to the said Henry D. Bacon (for Page & Bacon) in satisfaction or pretended satisfaction of the claim of the said Page & Bacon against the said Ohio and Mississippi Railroad Company, which obligation, it is said, will take the shape of ' income bonds' of said Ohio and Mississippi Railroad Company. Plaintiffs can not see how much credit is due to this rumor, but it comes to them in such a shape that they believe it to be true, and therefore so charge it. And plaintiffs pray that the proposed sale of the property, effects and franchises belonging to the Ohio and Mississippi Railroad Company, on the 8th day of August, 1855, may be forbidden, enjoined and restrained by order of this court; that said Joshua H. Alexander, Daniel D. Page, Henry D. Bacon, Thomas Brown and Edward Wyman, their agents and representatives, be each and all forbidden to sell or advertise for sale the said property, effects and franchises, or any of them, or any part thereof, by authority or color of said instrument of writing, dated June 5th, 1855, until the further order of this court; that the said instrument of writing be declared inoperative, inefficacious, invalid and void for the purpose of conveying or affecting any of the property, effects and franchises of said Ohio and Mississippi Railroad Company, and that the same be delivered up to be cancelled and destroyed; that the said Page & Bacon be ordered and decreed to state an account of all the moneys by them received from or to the use of the said Ohio and Mississippi Railroad Company, and of all the securities of whatever kind by them received from or to the use of the said

company, and the manner in which the same have been disposed of ; and also that said Page & Bacon state an account of all the moneys by them paid and advanced to the said Ohio and Mississippi Railroad Company, and a full claim of whatever nature and description the said Page & Bacon may have against the said Ohio and Mississippi Railroad Company, beginning with the organization of said railroad company and coming down to the 5th day of June, in the year eighteen hundred and fifty-five, stating each particular item separately, so as to enable each item to be examined into and scrutinized by itself, and that the said Ohio and Mississippi Railroad Company be enjoined and restrained, until the further order of this court, from issuing any obligations or negotiable security to the said Page & Bacon, on account of the said claim of said Page & Bacon, whether said obligation or negotiable securities be 'income bonds' or instruments of whatever sort, and that no steps be taken by said directors or the said Ohio and Mississippi Railroad Company towards acknowledging, securing or paying or giving any security or satisfaction to the said Page & Bacon for or on account of the said claim of the said Page & Bacon against said railroad company until there be a legal and judicial or other satisfactory ascertainment (to be approved by this court) of the amount of said claim, and the balance, if any due thereon, and that the said Joshua H. Alexander be required and ordered to file and present to this court a true account and statement of his acts and doings under and by color of the said instrument of writing of June 5th, 1855 ; and that the court here will grant to the said plaintiffs such other and further relief in the premises as may be conformable to law and equity upon the facts by this petition shown."

An injunction was granted in conformity with the prayer of the petitioners. The enjoining order was made and served on defendants August 7th, 1855.

Defendants, in their answer, admit the incorporation of the Ohio and Mississippi Railroad Company by the legislature of Illinois, by the act of February 10th, 1851 ; also the amenda-

tory act of June 22, 1852 ; and also set forth a supplemental act of February 11, 1853, by which " the company are empowered to elect out of the board of directors a vice-president, who, in the absence or disability of the president, should have the same powers and perform the same duties as the president, and such other duties as the by-laws or resolutions of the board might prescribe."

Defendants admit the passage of the act of the general assembly of the state of Missouri, approved March 1, 1851, and state that " by another act of the general assembly of Missouri, entitled ' An act to reduce the law incorporating the city of St. Louis, and the several acts amendatory thereof, into one act, and to amend the same,' approved March 3, 1851, it was provided that said city should not at any time become a subscriber for any stock in any corporation ; said last mentioned act was in full force at the date of the said pretended subscription by said city to the capital stock of said company—that is to say, on the 4th day of April, A. D. 1851, and these defendants say that said pretended subscription, on the part of said city, was and is illegal, null and void, for the want of power to make the same, there being no law in force at the time of making the same or since to authorize it. The defendants say that in the said act entitled ' An act to authorize the county of St. Louis to subscribe to the capital stock of the Ohio and Mississippi Railroad,' approved January 26, 1853, it was provided that, ' to authorize said subscription on the part of said county, the County Court of St. Louis county should first submit the question of making said subscription to the qualified voters of said county, and if a majority of those voting should be in favor of such subscription, the County Court should at once proceed to make the same for the county.' But the defendants say that the said act, approved January 26, 1853, did not take effect as a law of the land till the expiration of ninety days from its approval, and that the question of said subscription contemplated by said act of January 26, 1853, never was submitted to the qualified voters of said county under the provi-

sions of said act. That it may be true that on the 14th day of February, A. D. 1853, said county court did order an election to be held by the qualified voters of said county, as to whether such subscription should be made ; and it may be true that on the 7th day of March, A. D. 1853, a small portion of the qualified voters of said county did vote in favor of sa'd subscription, a still smaller portion voting against it ; and it may be true that the said county court did, on the 16th of March, pretend to subscribe to the capital stock of said company the sum of two hundred thousand dollars. But it is not true that any election was ever ordered at any other time in relation to said subscription, or that any election was ever held at any other time in relation thereto ; nor was any subscription made at any other time by said county of St. Louis to the stock of said company. And the defendants say that neither on the said 14th day of February, 1853, nor on the 7th day of March, 1853, nor on the 16th day of March, 1853, was there any law in force to authorize any subscription to the stock of said company, nor has the question of subscribing to said stock ever been submitted to the qualified voters of said county since the said act of January 26, 1853, became a law."

The answer then proceeds to deny severally all the allegations of the petition touching the alleged fraud or breach of trust, but does not state the accounts asked for in the petition.

The defendants' answer was filed October 9, 1856. Plaintiffs filed exceptions to the answer, as follows : " The plaintiffs come and except to the answer of the defendants in this cause filed, for the following reasons : first, because the defendants, Page & Bacon, do not show their account with the Ohio and Mississippi Railroad Company, as required by the petition of plaintiffs ; second, because the said defendants do not discover the state of the account of the Ohio and Mississippi Railroad Company on the one part, and the firm of Page & Bacon on the other part, as required by the petition and writ in this cause ; third, because until such a statement of the accounts between the said parties, there are no means of deter-

mining whether the defendants have answered the equity of the bill or petition; f n rth, because the said answer is insufficient and defective in this, that it contains a general statement that the petition (except in a few detailed particulars) is false without more, which is a v cious an improper form of answer; wherefore the plaintiffs pray that the defendants may be held to make a further answer in this cause." The court overruled the exceptions taken to the answer.

The defendants moved the court to dissolve the injunction, and the case coming on to be heard on this motion, it was agreed b both parties that the court should proceed to hear the whole cause, and make a final decree therein at the same time that the consideration of the motion to dissolve said injunction was taken up, and the court consented thereto, and announced that, for the purpose of making a final decree in said cause and disposing of the same, the issues made by the pleadings would be taken up in their order, and that the first inquiry would be, " wh tl er the plaintiffs, or either of them, were stockholders of the Ohio and Mississippi Railroad Company;" after determining which, the court would, if necessary, proceed to examine the other issues involved; and thereupon each party waving a jury, and consenting to the order of proceedings indicated, evidence was given touching the matters designated as the first subject of inquiry by the court.

This evidence, which it is unnecessary to seth forth, showed that the City of St. Louis subscribed to the stock of the Ohio and Mississippi Railroad Company under the act of the general assembly of March 1, 1851. The court found, among other facts, " that the only election ordered by the county court of St. Louis county respecting the subscription contemplated by the act of 26th January, 1853, or ever had in relation thereto, was that which is mentioned and recited in the order [of the county court] of March 16, 1853, or held on the 7th of March, 1853, of the said court; that the presiding justice of the St. Louis county court made or purported to make

said subscription some time between 16th March, 1853, and June 11, 1853."

The court declared the law to be that neither the City nor the County of St. Louis was a stockholder of said Ohio and Mississippi Railroad Company, and that the injunction granted should be dissolved and the petition dismissed. The injunction was accordingly dissolved October 30, 1855, and the petition dismissed.

The ascertainment and assessment of the damages occasioned to the defendants by the granting of the injunction was by consent of parties submitted to the court, sitting as a jury, no evidence being offered on either side, and the court finding no facts. The court assessed the total damages at $85,727 85.

The plaintiffs filed their motion for a review, which being overruled, they appealed to this court.

*T. T. Gantt, R. M. Field, W. L. Williams, R. J. Barrett,* for appellants.

*T. T. Gantt,* in a written brief, urged the following views:

I. The plaintiffs had a right to a discovery from the defendants in aid of their suit, in respect of the matters of which discovery was sought by their petition. The practice act of 1849 (art. 24) does not destroy this right.

II. The City of St. Louis was a stockholder in the Ohio and Mississippi Railroad Company. It is admitted that she was unless the act of March 1st, 1851, (Sess. Acts, p. 722) was repealed by § 13 of art. 7 of the act of March 3d, 1851 (id. p. 168). The appellants deny that this act, which certainly furnishes the general rule of action for the city, was designed to repeal the particular authority conferred by the act of March 1, 1851, for the following reasons: 1. Because no such intention is declared. 2. Because no such intention can be inferred from the language used. 3. Because the two acts are in *pari materiâ,* and are, if possible, to be so construed as that both may stand, which is not only a possible but a necessary construction, because the legislature could not have designed to

repeal the special license of March 1, 1851, by implication, two days after it had been given, and before it could possibly be exercised. 4. Because nothing short of the most express words will suffice to raise the presumption of an intention on the part of the legislature thus to undo their recent wo·k. 5. Because, by looking into the several acts incorporating the city of St. Louis and amendatory thereof, which were in force up to the 3d March, 1851, we find that the provision supposed to have the effect of controlling and repealing the legislation of March 1, 1851, first went into effect by virtue of the charter of 8th February, 1843, and that it occupies the same place in that charter as in the charter of 1851, viz., § 13 of article 7; that the titles of the charter of 1843 and the charter of 1851 are the same precisely, and that each purports to be a consolidation or codification of the several acts in force defining the chartered privileges of St. Louis at the dates of said acts respectively. For the sake of convenience, these acts we e codified and amended in 1843, and in 1851 certain provisions were retained in each instance in the same words. The provision in question appears for the first time in 1843. It has been in force since then without an interval. Then it was not intended by the legislature to allow this provision, as it stood in the amended charter of 1843, to impede or annul the special license granted on 1st March, 1851. But, at that very time, (as, we can not deny, appears by the history of the acts of the session of 1851, and as we are bound to know by the constitution of the state, which requires each bill to be read on three successive days,) a bill had been introduced codifying the laws relating to the powers of the city government, and retaining this provision as a salutary one. It was not a new provision then introduced for the first time. It was a provision which had been in force for eight years, and was continued in force by the amended charter of 1851. It is to be regarded as having been passed in 1843, and merely continued in force down to the present time. It is said that in 1847 and again in 1849 this clause had been repealed, and did not exist in its integrity in

1851. But this only means that certain exceptions to the general rule declared in 1843 had been created by the acts of 1847 and 1849. The general rule existed. The exceptions carved out of it stood upon their own grounds, and these exceptions were not and could not be annulled by re-enacting the rule. The rule, as a general rule, never ceased to exist from 1843 to the present time, and no greater force was given to it, and no greater scope by reason of its re-enactment in 1851. It stood then as it stood before the codification; *the general rule*, to which sundry exceptions existed by virtue of dispensing or licensing acts. The following authorities are cited on these points : Canal Co. v. Railroad Co., 4 Gill & Johns. 1 ; Cass v. Dillon, 2 Ohio State R., N. S. 607 ; 5 Florida, 185 ; 4 Arkansas, 410 *et seq.* ; Dwarris on Statutes, 269, 533, 672 ; Mitchell v. Halsey, 15 Wend. 242–3 ; 9 Pick. 87 ; Copen v. Glover, 4 Mass. 305 ; Pease v. Whitney, 5 Mass. 380 ; Williams v. Pritchard, 4 Tenn. 2 ; 7 Bacon's Abr. 457, 459.

III. The County of St. Louis was a stockholder. 1. The authority to subscribe was given by the first section of the act of 26th January, 1853. (Sess. Acts, p. 376.) The second section prescribes certain formalities to be observed by the county court before making the subscription ; but, so far from making the power to subscribe depend upon the observance of these formalities, it uses language which, by the strongest implication, has the contrary import. A certain cautionary, and perhaps very expedient, step was enjoined upon the court. But the disregard of this injunction does not destroy the power. No such consequence is denounced by the act, and it is not a necessary result from its terms. 2. It was said that this act did not take effect until the end of ninety days from its passage. Perhaps not as to the exercise of the power to subscribe. But it contained a direction to the court to take the sense of the people of the county on the question of the propriety of the exercise of this power, and if this could not be taken until the expiration of ninety days, then the law was not, according to the argument of the respondent, to be in force until some period

greater than ninety days had elapsed. It is quite plain that no subscription was actually made prior to the month of July, almost six months after the date of the act. 3. But again it is insisted that the defendants are not competent to inquire into the regularity of our subscription to the stock of the company. That is a question which can only arise between the company and us, where we claim the rights and privileges of stockholders. The defendants have no interest or capacity to inquire into the means by which we became possessed of our stock. We are stockholders *de facto*, and that is enough.

IV. The court erred in making the assessment of damages. No damages were proved. The injunction did not cause for one moment the loss of the road, or the suspension of its use. It is alleged in the petition, and not denied, that the road and its franchises were in the hands of Alexander, one of the defendants. The injunction left them there. It was alleged that the company were about to issue income bonds to Page & Bacon. But, though the injunction forbids the doing of this, the answer denies the intention. No facts were found and no evidence was given; yet the court proceeded to give judgment for $85,000 and upwards for this injunction. Was it a conclusion of law that such damages resulted from the order? If not, there was error in the action of the court.

*Glover & Richardson* and *N. J. & G. P. Strong*, for respondents.

I. Plaintiffs' petition contained no cause of action. 1. This is manifestly not a petition seeking to have the defendants account to the plaintiffs of and concerning the matters mentioned therein. The petition itself states and shows that there has already been an accounting as to the matters in question, and a balance struck, and a note given on the footing of the account, and a security taken. 2. It is not a petition for the opening and re-examination of an account stated, as is under certain circumstances sometimes allowed in equity, because there is no specification of any error, fraud, imposition, undue advantage or any other wrong done by any of the parties to the

adjustment of the account, on which the chancellor could proceed in that behalf. This is the fatal defect in the petition, if the cause of action was intended to be the opening and reexamination of the account stated. If such an allegation of error is sufficient, how are the defendants to meet it? Should they be compelled to show the justice of every item in the whole account? If the plaintiffs can swear there is $6 or $700,000 of the note unjust and fraudulent, they can specify the items. If they can not specify, then they do not know what they swear. The petition virtually admits that $500,000 is due to Page & Bacon. For, while the note is evidence under the law of the whole debt, and it is not denied that the $500,000 is due, the plaintiffs' protesting against it as evidence, not admitting it, or disclaiming to admit, is no impeachment of its validity, even by the general allegation of fraud he employs as to the residue of the note. His objection, then, is to certain items of the account, while he fails to specify, which leaves his pleading bad. 3. It is not a petition to cancel and annul the account stated, on the ground that it was obtained by fraud, covin, misrepresentation, &c. It is true, the petition says the instrument is not the note of the company. But the pleading also says it was ratified by a board of six directors; that it was executed and delivered as a security and settlement of the account, and the directors meant it as the act of the company, acknowledging the debt named in it. What, then, becomes of the *non est factum?* It falls back into the notion that the note is fraudulent and void, because all the money mentioned in it was not due, which we have seen gives the plaintiff no cause of action, unless he specifies what is the objectionable part in such language as will enable the parties to try the truth of the specification fairly and certainly. (1 Vesey, jr. 287; 15 Wend. 83; 4 Paige, 495; Baldwin, 394; Hopkins, 239; 2 Edw. Ch. R. 22, 293; Story's Eq. Pl. 211; 1 McCord, 156; 7 J. Ch. R. 69; 12 Pick. 249; 2 J. Ch. R. 217; 3 Iredell, 54; 1 Story's Eq. 497, 500; 10 Leigh, 434; 3 Sumner, 70; 9 N. H. 230; 1 Paige Ch. 100, 426; 2 id. 509; 3

id. 421 ; 4 id. 111, 439 ; 5 id. 112 ; 6 id. 295 ; 2 Green's Ch: 429.)

II. Plaintiffs were not entitled to the discovery sought.

III. The court did not err in dismissing the plaintiffs' petition on the hypothesis that the plaintiffs had no interest in the relief prayed.   They had no interest.   1. The act of the general assembly of Missouri, approved March 1, 1851, authorizing the City of St. Louis to take stock in the Ohio and Mississippi railroad was repealed by the act of March 3d, 1851. (Smith's Commentaries on Stat. Construction, 759, 903, 910 ; Dwarris on Stat. 530 ; Rev'd Ordinances of St. Louis, 1853, p. 120 ; Sess. Acts, 1847, p. 182, 348 ; Sess. Acts, 1851, p. 155, 60, 364, 721, 170 ; Sess. Acts, 1849, p. 159 ; 2 Bibb, 96.)   2. The County of St. Louis, in the matter of her proceeding to procure stock, acted without authority of law, and took no interest whatever.   The act under which the county proceeded (Sess. Acts, 1853, p. 376) was approved January 26, 1853.   By the general law appropriating the time when statutes shall take effect (R. C. 1845, p. 695) this act became a law of Missouri at the end of ninety days from January 26, 1853.   No election was ever held, as required by the act, after the act took effect.   But it was the express requisition of the act, that, before any subscription should be made, the county court should submit the question of making it to the qualified voters of the county.   The power to subscribe rested on a voting to be had after that act took effect.   (2 Cowen, 419 ; 3 Brevard, 396 ; 4 Gilmore, 24 ; 10 Mo. 121 ; 1 Kent, 146 ; 15 Peters, 445 ; 23 Maine, 360.)

IV. The court did not err in the matter of the assessment of damages.   There was no motion for a review of the assessment of damages.

Per CURIAM.   The most important question in this cause is, whether the City of St. Louis, under her charter, had authority to subscribe for stock in the Ohio and Mississippi Railroad Company.   The charter of the city, at the time the subscrip-

tion was made, contained a clause which prohibited the city at any time from becoming a subscriber for any stock in any corporation. The charter containing this prohibition bore date March 3d, 1851, and was entitled "An act to reduce the law incorporating the city of St. Louis, and the several acts amendatory thereof, into one act, and to amend the same." From the title of this act, it will be seen that it was one consolidating the several acts in relation to the charter of the city of St. Louis. The prohibition against the subscribing for stock above mentioned was not original in the charter of 1851, but was first introduced into the charter of 1843. The special act, under which the subscription was made, bore date on the 1st of March, 1851. Now, as the charter, which contained the prohibition against subscribing for stock, bore date on the 3d of March, and that authorizing the subscription, on the first of the same month, in the same year, it is maintained that the statute of the later date repealed that of a former date, and consequently there was no authority in the city to subscribe for stock in the Ohio and Mississippi Railroad Company. There is no doubt of the correctness of the general rule that *leges posteriores priores contrarias abrogant.* But this rule is not of universal application, and we are of the opinion that the circumstances of the case under consideration do not furnish an instance for its enforcement. It is a rule in the construction of statutes, that all acts passed on the same subject, *in pari materiâ*, must be taken and construed together, and made to stand, if they are capable of being reconciled. There is nothing irreconcilable between a general prohibition to subscribe for stock in corporations, and a permission to subscribe for stock in a particular corporation. Nothing is more common than a general prohibition, with indulgence to particular individuals. The general restriction in the charter of St. Louis of 1843, was frequently relaxed, so as to permit subscriptions for stock in various corporations. If the general restriction against subscriptions for stock contained in the charter of March 3d, 1851, was original, and then introduced for the first time, we

are not prepared to say that it would repeal the special per-
mission to subscribe to the Ohio and Mississippi Railroad Com-
pany, granted by the act of March 1st, 1851. But that is not
this case. The prohibition against subscription was in full
force when the act of March 1st was passed. That act was
passed to remove the restriction. Now the effect of the revi-
sion of the charter, on the 3d of March, 1851, was, not to make
former provisions, which had previously existed, and which
were continued, to begin from that date, but for convenience
sake to embody all the acts in relation to the charter into one law,
leaving the acts in force at the time of the revision to take
date from the period when they were first passed. It would be
of the most mischievous consequence to hold that the revision
of a law had the effect of making the revised law entirely ori-
ginal, to be construed as though none of its provisions had
effect but from the date of the revised law. When a former
provision is included in a revised law, it is only thereby intend-
ed to continue its existence, not to make it operate as an ori-
ginal act to take effect from the date of the revised law. The
revision has not the effect of breaking the continuity of those
provisions which were in force before it was made. In all the
revisions of our laws, which the constitution requires to be done
at stated periods, it has never been supposed that, because the
revised laws were made to bear date from their approval, we
were therefore prevented from looking back, and ascertaining
when a law was first passed, and dating its existence from that
time. It was never thought that the revision for one moment
interrupted the continuity of the act. The forms for enacting
laws were complied with in making a revision, in order to give
effect to amendments, or any new provisions that ought to be
introduced.

If, then, we regard the restriction against subscriptions for
stock as originating in a provision as early as 1843, and as
the act imposing that restriction was in force when the act of
March 1, 1851, authorizing the subscription was passed, the
embodying the restriction in an act of a subsequent date amend-
33—VOL. XXIII.

ing and reducing into one act the several acts incorporating the city of St. Louis can not have the effect of repealing the law which conferred on the city of St. Louis power to subscribe for stock to the Ohio and Mississippi Railroad Company.

It is urged by the respondents that the 25th section of the 7th article of the charter of the city, which contains the prohibition against subscriptions for stock in corporations, passed on the 3d March, 1853, enacts, that "all acts and parts of acts contrary to, and inconsistent with the provisions of this act, or within the purview thereof, except the seventh section of the act entitled ' An act to amend ' An act to incorporate the city of St. Louis,' approved February 8, 1839, are hereby repealed;" that this section repeals the act authorizing the subscription, passed on the 1st March, 1851, it being subsequent in date to the act of the 1st of March. These acts were passed during the same session. We may suppose that they were at the same time before the legislature. The one was purposely designed to remove a restriction which was then in force, and which was continued in force by the act of the 3d of March. If possible, these acts must both stand, if they can be reconciled, being in relation to the same subject matter. If the design of the enabling statute was to remove the restriction, as that restriction was in force when it was passed, we can not suppose that the legislature, by the section referred to, intended to repeal the enabling act, as the privilege thereby conferred was granted in the very teeth of that act, and was intended to remove its prohibition. As the privilege was conferred specially against the terms of the general law, we would not be warranted in inferring its repeal without a manifest intent so to do. There is no such inconsistency between the acts that they may not both stand. A general prohibition against subscribing for stock in any corporation may well subsist with a permission to subscribe for stock in a particular corporation. When an enabling act has been passed against the provisions of a prohibitory statute, it would be against all reason to construe any general provision as repealing the enabling act, un-

less the intent so to do is made clearly manifest. As the enabling statute was passed against a general restraining clause, why should any general word importing no such specific intent have the effect of repealing it?

Let us next see if the subscription made by the city to the stock of the Ohio and Mississippi Railroad Company was authorized by the statute law at the time or not. The first act necessary to be noticed in regard to this branch of the case is the act of the 17th of February, 1849. (Sess. Acts, 1849, p. 159.) This is entitled " An act to authorize the City of St. Louis to subscribe stock in the Ohio and Mississippi Railroad Company." Its provisions, as far as it is necessary to set them forth, are as follows : " § 1. The City of St. Louis, subject to the proviso hereinafter contained, is hereby authorized to subscribe stock, not exceeding the sum of five hundred thousand dollars, to the Ohio and Mississippi Railroad Company, incorporated, &c., and to issue the bonds of said city, not exceeding the maximum sum of stock, to pay for the same ; and to levy a special tax on all taxable property in said city to pay the interest on such loan ; *provided always, that the qualified voters of said city shall be in favor of such subscription, and that such loan and subscription shall be conducted in conformity to the several provisions of this act.* § 2. It shall be the duty of the mayor of said city, *immediately* after the passage of this act, to order ten days' public notice, containing a copy of this act, to be given in all the daily newspapers published in said city, in order that the sense of the qualified voters of said city may be tested as to the propriety of such subscription and loan on behalf of said city." The third section prescribes how this test is to be conducted, and declares that " no ballot shall be counted unless the words ' for the railroad loan' or ' against the railroad loan' be written or printed thereon ; and if it shall appear that there are more ballots ' for the railroad loan' than ' against it,' then the mayor and city council, &c., shall subscribe said stock, and issue said bonds," &c. The 4th section gives the mayor the

power, if it be necessary at any "time to accomplish the intent of the act, to convene a special session of the city council." Section 5 provides that "no subscription of stock shall be binding on said city until at least five millions of dollars shall have been subscribed, including the subscription authorized by this act, by good and responsible individuals or corporations." "§ 6. The mayor and city council of said city shall issue no bonds before the said whole amount of five millions shall have been *bona fide* subscribed in manner mentioned in the preceding section, and they shall be the judges of that fact. § 7. It shall be lawful for the mayor and city council of said city to issue the bonds of said city, to be executed from time to time, to an amount not exceeding in all one-half a million of dollars, payable not more than twenty years after the date thereof respectively, bearing interest payable semi-annually, and not exceeding the rate of six per cent. per annum, and to deliver such bonds to the said railroad company in full payment of the stock to be subscribed by the city as aforesaid, at par. § 8. The railroad company aforesaid shall not be allowed to sell, pledge, or in any manner dispose of, any one or more of said bonds, directly or indirectly, for less than ninety-five cents on the dollar, upon penalty of absolutely releasing the said city from the payment of the said bonds so disposed of, and a clause of forfeiture to that effect shall be inserted in each bond. § 13. The said city is authorized to subscribe said stock to said railroad company upon the express understanding that the construction of said road is to be begun and completed from both ends towards the centre simultaneously, as near as compatible with the nature of the work; and it is hereby provided that a material failure in this respect shall release the city from all further liability on account of said subscription of stock. § 14. The subscription of said stock by said city to said railroad company shall be accompanied by a copy of this law."

Such are the numerous restrictions and conditions upon which the city is to subscribe under the first act giving the power to

subscribe.  By this act it is necessary that the sense of the qualified voters of the city be taken as to the propriety of the city subscribing to the stock, before such subscription can lawfully be made.  There must be an election to ascertain whether a majority of such voters is " in favor of the railroad loan" or " against it."  And when such a test has been tried, and a majority of the ballots cast is in favor of such subscription and loan, then the city has the right, and not till then, to subscribe. But still, before this right can be exercised, many other matters are specified in the act as clogs and restraints thereto. These must be removed also.  We do not consider this requisition to test the sense of a majority of the qualified voters as to the propriety of the subscription before it can be made by the city, as merely directory.  It is a declaratory, positive prerequisite.  It must be complied with before the power can be rightfully exercised.  The act here can not be done lawfully if this prerequisite be not complied with ; it must be observed and obeyed in order to give vitality and legal effect to the act to be afterwards performed.  It is not a delegation of legislative power to the city authorities to do certain things before the act is to be a law, and, if not done, no law.  The act is a complete expression of legislative will.  It is a law in itself, and is as much a law, notwithstanding the mayor and city council should refuse to do any act under it, as if they were to comply fully with its mandates.  No act on the part of the city is required to make it a law.  The legislature must exercise the power to make laws.  The power remains with that body alone. It can not be delegated ; yet no one will deny to the legislature the power to pass laws with conditions on many subjects.  Still there may be conditions which would make such laws unconstitutional.  " A law opening a road on condition that the owner of the land over which it passes will give it for that purpose—a law for building a bridge on condition that individuals will contribute to the cost in certain proportions — a law altering, abridging or enlarging the vested powers of corporations aggregate, subject to the consent of such corporations — a law

giving to school districts a portion of the school fund on con-
dition that such districts will raise an equivalent or propor-
tional sum—are all instances of proper conditional legislation,
even though the assent of the corporators, in the one case, to
the change of their charter, or of the district, in the other to
accept the donation and comply with its terms, should be sig-
nified by a majority vote.   These are all good conditions, capa-
ble of being performed without in any way interfering with the
legislative will.   But the law declaring an offence, or provid-
ing a punishment, or repealing an existing law, on condition
that the governor or any other individual shall assent to it, is
as plainly unconstitutional.   It is the naked veto power.   It
substitutes for, or rather adds to, the legislative will another
will, which it makes necessary to the *existence* of the law.   This
is unconstitutional.   No one doubts it.   No one will pretend
that a law with such a condition would be good." (Per Har-
rington, Judge, in Rice v. Foster, 4 Harrington, 499.   See
Parker v. Commonwealth, 6 Barr, Penn., 510 ; State v. Field,
17 Mo. 529 ; Aurora v. United States, 7 Cranch, 382.)   But
this statute does not depend upon any condition for its force,
existence or sanction.   It is not unconstitutional.

On the 1st of March, 1851, the legislature passed another
act, entitled " An act to authorize the City of St. Louis to sub-
scribe stock in the Pacific Railroad Company and for other pur-
poses."   The first section of this act authorizes the City of St.
Louis to subscribe stock not exceeding the sum of five hundred
thousand dollars to the Pacific Railroad Company, &c., and to
issue the bonds of said city to pay the same, to levy a special tax
to pay the interest on the bonds, " any thing in the charter of
the city to the contrary notwithstanding."   By the 2d section
the mayor and city council could cause the bonds " to be ex-
ecuted from time to time to an amount not exceeding in all five
hundred thousand dollars, payable not more than twenty years
after date thereof respectively, bearing interest at six per cent.,
payable semi-annually, and to deliver such bonds, with coupons
attached, to said railroad company, in full payment for the

stock subscribed, at par." Section 3 prohibits the railroad company from disposing of said bonds for less than ninety-five cents on the dollar, upon penalty of absolutely releasing the city from payment of said bonds, and requires a clause of forfeiture to this effect to be inserted in each bond. The 4th section authorizes the city to issue the bonds from time to time as the work progresses, in proportion to calls made on individual stockholders. The 5th and 6th sections relate to special taxation to pay the interest on the bonds, its manner of assessment, and other regulations in regard thereto. The 7th and 8th sections authorize the city to sell the stock, or any part of it, and to provide for the redemption of the bonds, and to transfer the stock, or any part of it, to the payers of the special tax, &c. The 9th section has a most important bearing on this case, and is here copied entire. "§ 9. The City of St. Louis is hereby authorized to subscribe to the stock of the Ohio and Mississippi Railroad Company any amount not exceeding the sum of five hundred thousand dollars, or they may subscribe the whole or any part of that sum to the stock of any railroad company that may be organized for the construction of a railroad beginning or terminating at Illinoistown, or on the island known as 'Bloody Island,' in front of said Illinoistown, and opposite the city of St. Louis, which subscription shall be on the same terms, and subject to the same conditions, as are herein provided for subscriptions to stock of the Pacific Railroad Company. But nothing herein contained shall be so construed as to authorize said city to subscribe more than five hundred thousand dollars in the aggregate for the construction of any road or roads east of the Mississippi river." The 6th section repeals the 5th and 6th sections of the act of February 17th, 1849, heretofore cited in this opinion. A serious question has been raised, whether this last act of March 1st, 1851, by its 10th section repealing the 5th and 6th sections of the act of 17th February, 1849, does not thereby leave the balance of said act in force. This, in all probability, would be considered a reasonable interpretation of the repealing effect of the 10th section, if both acts were

consistent, and otherwise compatible with each other. But such is not the case. In the act of 1849 no subscription of stock shall be made until the sense of the qualified voters of the city, as to its propriety, shall be ascertained by an election. If a majority vote against it, none can be made. The act of 1849 was to be published immediately in all the daily newspapers of the city preparatory to testing the sense of the voters. This test must be had, and must be found favorable, or no stock can be taken. This must be done immediately. "The judges of election shall, if the board of aldermen of said city be not in *timely* session, be appointed by the mayor, and the presiding officers of the two branches of the common council of said city, or any two of said officers." (Sess. Acts, 1849, p. 159, § 3.) Such is the supposed necessity for immediate and rapid action, that the mayor is authorized to convene special sessions of the city council from time to time ; thus seemingly limiting the operation of this act to a mere temporary period of short duration. Again, the subscription of the city to the stock of the Ohio and Mississippi Railroad Company, under the act of 1849, must be with the express understanding that the construction of the road is to be begun and completed from both ends towards the centre simultaneously, as near as compatible with the nature of the work ; a failure in this respect shall relieve the city from all further liability. Now none of these conditions, restraints and prerequisites are to be found in the act of 1st March, 1851, authorizing the city to subscribe to the Pacific Railroad Company—no test of its propriety by a vote previously taken—no condition to begin the work at both ends. All these restraints are left out, and we may take it for granted that they were properly omitted. The twenty years for the maturity of the bonds, the six per cent. interest, the special taxation to meet interest, the inhibition to dispose of the bonds for less than ninety-five cents on the dollar, the power to transfer stock, &c., these provisions and restraints are in the act of 1851, also in that of 1849. Now, by the 9th section of the act of March 1st, 1851, the power is expressly given to the

city to subscribe to the Ohio and Mississippi Railroad Company, stock not exceeding five hundred thousand dollars ; which subscription shall be on the same terms, and subject to the same conditions, as are herein provided for subscriptions to the stock of the Pacific Railroad Company, but not to exceed the sum of five hundred thousand dollars for the construction of any road or roads east of the Mississippi river. Let us look at the conditions again. Nowhere do we find any election necessary to test the propriety of the city's subscribing to the Pacific Railroad Company. For aught that appears to the contrary, the test prescribed by the act of 1849 may have been fatal to the effort then to procure a subscription to the Ohio and Mississippi Railroad Company by the city. In 1851, the legislature did not think proper to submit the subscription to such a test. No amount of subscription by *bona fide* stockholders or corporations is a prerequisite to the Pacific Railroad subscription by the city ; and the city is authorized to subscribe to the Ohio and Mississippi Railroad Company upon the same terms, and subject to the same conditions, as are provided for subscriptions to the Pacific Railroad. Then, if the repeal of the 5th and 6th sections of the act of 1849 be considered an expression of the legislative will as to the balance of said act, and that the balance is unrepealed and in force, we must see how the provisions of the two acts coincide ; and if there is a material variance between them—repugnant and inconsistent provisions upon the same subject matter in relation to the same object—the last act, dispensing with prior regulations and tests and restraints, must supersede the former act. We hesitate not therefore to state, that, in our opinion, the subscription made by the city to the Ohio and Mississippi Railroad Company of five hundred thousand dollars, and the bonds given in payment thereof, under the 9th section of the act of 1851, are fully authorized, the subscription valid in law, and the bonds binding on the city.

As to the county subscription, so far as the facts appear before us by the pleadings, we will give our opinion, stating at first, that, from the bill filed in this case, it is most likely such a

question never presented itself to the view of the counsel of the petitioners, nor had they any idea that they would be called upon to meet it. This is not a proceeding on the part of the County of St. Louis to get clear of her subscription, nor does she wish to be released from it. She still adheres to her subscription, claims the benefit thereof, and contends before us, by her counsel, that her subscription was lawful, and she bound as " nominated" in her bonds. The act of the general assembly, approved January 26, 1853, is as follows : " § 1. The County Court of St. Louis county, in this state, is authorized to subscribe to the capital stock of the Ohio and Mississippi Railroad Company the sum of two hundred thousand dollars. § 2. Before the subscription hereby authorized shall be made, the County Court of the county of St. Louis shall submit the question of making said subscription to the qualified voters of said county ; and if a majority of those voting shall be in favor of such subscription, the County Court shall at once proceed to make the same for the county. § 3. The County Court may issue the bonds of said county to pay the stock that may be subscribed ; and the said Ohio and Mississippi Railroad Company shall receive said bonds in payment of the subscription of the county, upon such terms as said company and the county may agree upon ; and the said county may take such steps to protect the interests and credit of the county as it shall deem proper, and may appoint an agent to represent the county and vote for it and receive its dividends."

This act has no time specified when it is to take effect. Then, under the 2d section of article 3d of the act concerning laws, (R. C. 1845, p. 695,) it takes effect at the end of ninety days after the passage thereof. It was in force then not sooner than April 26th, 1853. The petition avers that the County of St. Louis did, after the passage of the above act, and before the year 1855, subscribe for four thousand shares of fifty dollars each of the capital stock of the Ohio and Mississippi Railroad Company, and did issue its bonds therefor, amounting in the aggregate to the sum of $200,000, which were delivered to the

Ohio and Mississippi Railroad Company. The defendants deny that the County Court did ever submit the question of making said subscription to the qualified voters of said county under the act of 26th of January, 1853. "They aver that that act did not take effect until ninety days after its passage, and that no vote ever was taken, in regard to the subscription by the county, after the law went into effect, nor was any election ever held under the law in relation thereto. They say it may be true that on the 14th day of February, 1853, said County Court did order an election to be held by the qualified voters of said county as to whether such subscription should be made; and it may be true that on the 7th day of March, 1853, a small portion of the qualified voters of said county did vote in favor of said subscription—a still smaller portion voting against it; and it may be true that the said County Court did, on the 16th of March, pretend to subscribe to the capital stock of said company the sum of $200,000; but it is not true that any election was ever ordered at any other time in relation to said subscription, or that any election was ever held at any other time in relation thereto; nor was any subscription made at any other time by said County of St. Louis to the stock of said company." The act of January 26th, 1853, requires that before the subscription by the county to the railroad company shall be made, the County Court of the County of St. Louis shall submit the question of making the subscription to the qualified voters of the county; if a majority of those voting shall be in favor of such subscription, the County Court shall at once proceed to make the same for the county.

It has been contended by the counsel for the petitioners that the part of the act in relation to submitting the question to the voters of the county is merely directory, and that, if the subscription be made without a vote, it is sufficient, and a failure to observe a mere direction will not vitiate the act; but if this be not so, then that part requiring a submission to the voters of the county is unconstitutional and void, and so, in that event, the subscription is a good one. We do not agree with the

counsel on this subject. The statute requiring the vote is not directory. It is a positive, explicit and plain mandate. It is not a direction. The voting on the question is an act positively and authoritatively required to be done before the subscription thereby authorized shall be made. Nor is the act referring the question to the vote of the county unconstitutional. Here is no delegation of legislative power, no conditional legislation even. The legislative will is expressed, and the act is in itself a complete embodiment of its will on the subject. Upon this subject we refer to what has already been said in regard to the act of 1849 requiring the vote of the city. It was illegal, in our opinion, for the County Court to subscribe stock under this act without taking the previous necessary step of submitting the question to the voters of the county, and the act must be in force before such a step could lawfully be taken. As the court below dismissed the petition because neither the city nor county was a legal stockholder in its opinion, and as the judgment will have to be reversed in regard to the amount of damages assessed, we have thought it most advisable not to conclude the county upon the facts set forth only in the petition and answer. We are not unwilling to meet this or any other question legally presented, but as there may be important facts and matters connected with the subscription on the part of the county, which, if properly brought before us, might have weight in settling this question, we decline now deciding further. We say there may be such facts; we know not whether there are such; but if there be, we are willing to let the county have the benefit of more fully and particularly making out her case. We have expressed our views of the act of January 26, 1853, but as there are but two judges of this court sitting on the trial of this cause, and as one of them entertains very serious doubts as to the legal right of the defendants to raise the question in this case of the ownership of stock on the part of the county, we forbear saying any thing more on that part of the case.

In regard to the assessment of damages, we think the court erred. The record shows that no evidence was offered or pro-

duced before the court in relation to the damages sustained by the defendants in virtue of this injunction. The statute declares (Sess. Acts, 1849, p. 85, § 12) that "upon the dissolution of an injunction, in whole or in part, damages shall be assessed by a jury, or, if neither party require a jury, by the court; but if money shall have been enjoined, the damages thereon shall not exceed ten per.centum on the amount released by the dissolution, exclusive of legal interest and costs." This section of the act of 1849, "concerning practice in courts of justice," is a copy of the 13th section of the act of 1845, concerning injunctions. (R. C. 1845, p. 580.) The injunction to stop the procedings of a trustee to sell property, under a deed of trust to pay a debt, has not been considered such an injunction upon money as to authorize the assessment of damages by the rule of per cent. laid down in the act alone. In the case of Kennedy's Exec'r v. Hammond & Hall, (16 Mo. 341,) this court held that the damages in such a case were not limited to ten per cent. on the debt, but might extend to the full amount of the debt, if the loss to the creditor by the injunction extended so far. The meaning of the words "if money shall have been enjoined" has been generally supposed to embrace injunctions upon the executions of judgments originating by debtor therein against his creditor, and not such as restrain other acts whereby money may in consequence thereof be deferred in payment by the interposition of third parties. Upon an execution against a debtor's estate, the payment of which can be enforced out of all his property, and the justice of which has been settled by the law through the intervention of its officers and tribunals ; if there be an interference by injunction, and it turn out to be without proper cause, and is therefore removed, then damages not exceeding ten per cent. upon the amount released from the injunction may be a just penalty-for improperly interfering, and a just recompense for the delay which such interference produced to the creditor. But such is not the case when a sale of trust property has been enjoined. Here the debt has been recognized by the parties only ; the law has not adjudicated

upon it. Then, when such a sale is enjoined by a third party, and the court, after a hearing, dissolves the injunction, it becomes proper to ascertain the damages, not by the rule of per cent., but from the injury the creditor has sustained from the improper act of the party stepping in between the creditor and the debtor, and hindering and delaying the execution of the means provided to enforce payment. Suppose in this case that the trust property was not worth half the debt intended to be secured, would the delay in the sale of it, caused by injunction, authorize the court to give ten per cent. damages for the detention and non-payment of the whole debt? What injury has the creditor sustained by enjoining the sale of property not worth one-tenth part of his debt? Again, suppose the injunction had caused the loss of the entire fund in trust, would ten per cent. on the debt be a proper amount of damages—the only amount which the law would recognize, although there be proof amply to show that the fund was in value equal to the debt? No. In all such cases the court, or jury, should determine the amount of injury by evidence before it, or them, as to the damages sustained, the probable amount that would have been realized, the value of money at the time, and other circumstances tending to show the damages sustained by the creditor in consequence of such injunction. It was therefore, in our opinion, error in the court below to assess, without proof, the sum of money in this case as damages to the defendant, and its judgment must be reversed, and the cause remanded.

SCOTT, Judge. The objections, principally urged against the sufficiency of the petition, seem to be founded on the idea that this is a proceeding to re-open a stated account, and it is maintained that there is no cause set forth in the petition which entitles the plaintiffs to this kind of relief. It is conceived that this is not the design of this action. In a late case in the Supreme Court of the United States (Dodge v. Woolsey, 18 How. 331), it is held that a stockholder in a corporation has a remedy in chancery against the directors to prevent them

from doing acts which would amount to a violation of the charter, or to prevent any misapplication of their capital or profits, which might lessen the value of the shares, if the acts, intended to be done, amount to what is called in law a breach of trust or duty. From a careful examination of the facts stated in the petition, it would seem that its aim is to prevent an act on the part of the directors of the Ohio and Mississippi Railroad Company, which would be a misapplication of its capital, amounting to a breach of duty or trust. The petition, in substance, alleges that four directors of the company, without authority, by reason that so small a number could not act on the subject, fraudulently combined to allow a demand against the company greatly exceeding its true amount, executed a bond for the sum thus ascertained, and gave a deed of trust, to secure its payment, on all the real estate of the company then possessed, or that might thereafter be acquired, in the state of Illinois, on all engines, locomotives, tenders, &c. ; on all other property of whatsoever kind, which was then or might be owned by such company ; on all tolls, income, revenues, issues and profits of the property thereby conveyed ; and all privileges, franchises, easements, rights and interests whatsoever, then possessed, used or enjoyed, or which might thereafter be acquired or possessed by the said company. The petition morever alleges that a member of the firm, to whom this debt was allowed, was one of the four directors by whom it was allowed, and that another one of the said four directors was the trustee named in the deed of trust given to secure the payment of the debt. It is admitted that four was the least number of directors that could act ; so the concurrence of one of the interested parties must have been had in order to render the acts valid. Now the petition prays that the sale under the deed of trust thus obtained shall be enjoined until the further order of the court ; that the deed of trust and security be declared void, and that the defendants render an account, &c. It must be clear that if the law furnishes no redress for wrongs of this kind by the directors of companies, there is an end of all moneyed corporations. No

sane man would vest his money in them unless with a view to obtain their control. In a matter of so great amount the law does not allow a man to judge for himself, or to vote himself a trusteeship, the management of which may be a fortune. Nor is the matter bettered by the subsequent ratification procured by means of calling in three other directors. The idea of a ratification must have grown out of complaints or surmises as to the fairness of the transaction. The three composing the last board, who had done the first act complained of, were committed by what they had previously done. They made one-half of the last board, and it is not to be expected that they would have convicted themselves of having done wrong. The three new members could not control. Under such circumstances the ratification could have been only colorable. The first three directors should have retired and made room for those who were uncommitted. This, then, is no proceeding to re-open a stated account. It is founded on the idea that there has been no lawful settlement of accounts between the parties. It is conceived that the facts stated in the petition, if established, would show such a misapplication of the property of the company as would amount to a breach of duty, and bring this case within the principle laid down by the Supreme Court of the United States in the suit to which reference has been made.

RYLAND, Judge. In regard to the granting of the injunction in the first instance by the court below, my own individual opinion is, that the petition was not sufficient to warrant the injunction.

It is not denied that the corporation had power, under its charter, to borrow money, and mortgage its franchises and effects to secure the repayment. The law may be considered as settled that a corporation may convey its property in trust to pay its debts, and, like an individual, may prefer one creditor to another. (2 Kent's Com. 314, note.)

The plaintiffs' petition stated, in substance, that four directors of the corporation made the deed in this case, affixing

thereto the corporate seal, to secure the note for \$1,158,484 61 ; that neither said deed nor note was the act of the corporation ; that said four directors had no power to make them ; that the by-law which allowed the four directors to constitute a quorum was contrary to the charter and void ; that said note and deed were fraudulent ; that Henry D. Bacon, one of the firm of Page & Bacon, was a director of the corporation, and one of the four ; and that Joshua H. Alexander, the trustee, was another ; that said four directors had combined to give said note and deed to defraud the stockholders, by giving said securities for so large an amount, when the plaintiffs state that they believe not more than \$500,000 was due Page & Bacon, and they did not admit any thing was due. The petition also states that, after the making of said deed and note, another meeting of directors was held, and a resolution passed ratifying the same ; that at this meeting three of the four directors were present and acted ; that said three procured said ratification, and that said last mentioned proceedings were also fraudulent ; that six directors were present at this meeting.

It will be observed that the invalidity of the deed and note are asserted on two grounds : first, that they are void, as made with fraudulent intent ; second, that they are void as made without lawful authority. The fraud charged in the petition against the four directors rests upon the allegation that part of the debt was unjust ; for if we can consider the whole debt honestly due, though a question might be made as to the power of the four directors to make the deed and note, it is impossible to impute to them a fraudulent intent. The most that could be said would be that they had attempted to secure honest creditors their debt, and failed because they had no power to act. In regard to the defendant Bacon, if the debt claimed was perfectly just, what moral delinquency could attach upon him for attempting to secure it ? If the law forbade him to act as a director in allowing his own claim, that is quite a different question, but does not touch the subject of fraud. The important inquiry then is, whether this petition can be regarded as

asserting by any proper sufficient allegation that the debt of Page & Bacon was not as represented by the deed and note. I am well satisfied that, upon the long and well-settled rules of pleading, it can not be so regarded. The allegation that the plaintiffs believe that not more than $500,000 of the debt claimed was due, and they did not admit any thing was due, is the whole basis of the fraud. When the corporate seal is affixed to an instrument, it is presumed to be the act of the corporation. (Angel & Ames on Corp. 194.) The object, then, must be to impeach and overthrow the instrument by affirmative matter. The matter relied on here is the supposed fraud as to part of the debt claimed. If there was no debt at all, that would certainly constitute fraud. But there is no such allegation in the petition. If any material part of the debt claimed was pretended only, fraud might be predicated on that; but no such allegation as that is contained in the petition.

If any thing is settled as matter of pleading, it is that when a part of a debt or consideration is denied, and fraud in consequence is charged, and relief is asked, as by cancelling or annulling instruments, the particular part thereof intended to be put in issue must be so specified by items as that the opposite party may know what is objected to. (15 Wend. 83 ; 4 Page, 495 ; 2 Johns. Ch. 210 ; 1 Bald, 418 ; Hop. 256 ; 2 Edw. Ch. 23 ; 4 Cranch, 306 ; 7 Cranch, 147 ; 20 Johns. 669 ; 23 Verm. 720 ; 4 Hals. 657, 795.) Story says, (Eq. Pl. 211,) where a bill seeks a general account upon a charge of fraud, it is not sufficient to make such a charge in general terms, but it should be pointed, and state particular acts of fraud. So in a bill to open a settled account, it is not sufficient to allege generally that it is erroneous, but the specific errors should be pointed out. Here it is said, not more than $500,000 are due ; *the rest of the claim was fraudulent*. If such an allegation is to be taken for any thing, what does it apply to ? How are the defendants to meet it ? When the balance of the accounts amounts to more than a million of dollars, we may suppose that the whole account amounted to many mil-

lions. False items entering into the account at any period, or anywhere, may bring out the fraudulent balance. Was a defendant ever required to go to trial on such an allegation? It can not be evaded that this allegation supports the whole charge of fraud contained in the petition. Is it susceptible of trial? If so, how is the court to prevent the plaintiffs from litigating every item of the debt, although a part of it is not denied nor put in issue? In my opinion, this allegation is too general and loose to raise an issue on the debt mentioned in the deed and note, and that it must be treated as entirely insufficient. It is conceded that in a bill to open an account stated, this averment would be insufficient. It would only be insufficient in such case because it is no denial of the debt in a legal point of view. Then there is no denial in legal form of this debt. That the plaintiffs were not able to state that any specified portion of the debt was unjust, is only a good reason why they should not have made the general statement contained in their petition. If they needed information, the law was open to them, and ample means were afforded to get it. There being then no legal showing in the petition that the debt claimed by Page & Bacon was unjust, the general allegation of fraud falls to the ground, and leaves nothing but the question of power in the execution of the securities.

After a careful examination of the whole subject, my opinion is, that the note and deed were made by competent authority. It appears by the petition, the board might consist of not less than seven nor more than seventeen directors. Four then might be, and I must suppose was, a majority of the board. There would be no question of their power to set the corporation seal to these securities but for the fact that Bacon, the creditor, and Alexander, the intended trustee, were among them. These facts, it is contended, rendered the instruments void. The subject is not free from difficulty. Strong considerations exist to repel any view that may be taken of it. It is an approved maxim that no one shall act in a matter where he is interested, but, like other rules, it has been found incapa-

ble of universal use. In the management of corporations by a board of directors charged with the disposition of its stock, and the duty of providing for its funds, this maxim seems to have yielded in a great degree to the necessity of the case. It is known that in all stock corporations the directors are expected to be, and often must be, stockholders. This leads inevitably to complicated dealings and conflicting interests between the corporation, as such, and all the individual members who compose it. It is impossible that the persons who constitute the directors of a corporation will not, in the course of its management, become interested, as a class, against the corporation itself; and if such an interest will disqualify them to sit in the board, there must be an end of the corporation. I suppose there is not a railroad company or corporation in the United States, in which it has not happened that the directors have been called to act in ordering theselves and others to pay instalments, or in granting extension of stock payments, or otherwise deciding dues and claims on their own votes. This results from the doctrine that the corporation may contract with one of its members or corporators; and the right of a corporator or director to vote on a question in which he is interested, would seem to be inseparable from that doctrine. In the case at bar this corporation found no difficulty in contracting with the defendant Bacon, while sitting and voting as one of its directors, and in binding him and his firm to supply them with funds, so far as we know, for a series of years, to promote all their objects; but, when the amount of the loan is to be adjusted, it is supposed that he is disqualified to participate in ordering a security for paying the debt. I can see no reason why a member of the board of directors might not sit in the board, and, without fraud, in conjunction with others, consent to an order for securing a debt actually due to him from the corporation. The bare fact is not evidence of any fraud in such director, particularly when no averment is made, in an issuable form, that the debt was not fair and honest. It is believed that, when an unfair and fraudulent security is taken in this way, the law af-

fords to any party injured thereby ample remedy ; but it will be necessary, in such case, to present to the court something more than a general guess that the debt is unjust and fraudulent.

These views are not unsupported by the opinions of able jurists who have gone before us.   In Hayward v. The Pilgrim Society, the case was this : The trustees of the Society were authorized by vote to appropriate its funds.   They expended all the funds of the corporation, and yet a debt remained for the erection of a building they had contracted to put up, for which they were personally responsible.   It was in this emergency that the trustees, all of whom were interested in relieving themselves from loss, voted that their treasurer should give a note to one of their number, who paid the debt, and thus protect the voters.   It was held that, by virtue of their authority to manage the finances of the concern, they had power to authorize the note, and that the note was valid.   (Angel & Ames on Corp. 290 ; 21 Pick. 270.)   Chitty says (Chitty on Cont. 276, note e) " a member of a corporation contracting with the corporation must be deemed, in respect of that contract, a stranger to the corporation."   In Gordon v. Preston, (1 Watts, 386,) a mortgage was made by a quorum of the board, but at a meeting not regularly called.   The mortgage was made to the president of the board, and the treasurer of the corporation, who was also a member of the board, and both the mortgagees were present as part of the quorum that ordered the execution of the security.   It was held by Chief Justice Gibson that the instrument was not valid, because there was no regular meeting of the board ; but it was also held that the fact that the mortgagees were members of the board, and participated in the proceedings, could not affect their title.   The Chief Justice said : " That a corporator may sustain the relation of debtor or creditor in regard to the corporation, and in the latter character receive a security, is a proposition which requires not the aid of argument."

In the Railroad Company et al. v. Claghorn et al., (1 Speers'

Eq. R. 562,) the directors had endorsed notes of the corporation, and voted a security to indemnify themselves against loss. Chancellor Johnson said: "There is, upon a superficial view, something very startling in this, if the facts be true, and they probably are as to some, perhaps all the endorsers; but the alarm will cease when we take into consideration the motives and influence which operate upon men to lend their credit to assist corporations to pursue their enterprizes. The directors of a corporation ought to be, and generally are, better informed as to its liabilities and resources than any one else; and if they, having the means, refuse to aid them in their operations by loan of money, no one else will do it. And there is nothing in law or equity which forbids a director of a corporation from contracting with it. He stands in the same relation to the corporation as any other individual would, under the same circumstances. If, by greater diligence and without fraud, he can fairly gain an advantage over other creditors, he is entitled to retain it." It was ruled in this case that the directors voting a security to themselves, was no evidence of fraud. In 1 Pick. 297, there is a case decided by C. J. Parker—The Proprietors of the Canal Bridge v. Gordon. There were three distinct corporations, the members of which consisted of the same individuals. It was held that the contracts they made with each other were valid. The ruling went upon the idea of ascertaining the effect of the contracts in the same way as if made by parties not involved in conflicting duties and interests. (Angel & Ames on Corporations, 205.) In Connell et al. v. Woodard et al., (5 How. Miss. 665,) a suit was brought and prosecuted to success by Hugh Connell, Arthur Daniel, William A. Chisholm, Daniel Woodard, William T. Mayes, trustees, against Daniel Woodard, William T. Mayes and J. S. Watt. Of course the parties had power to contract in that way. In R. M. Charlton, 260, it was held by Davies, Judge, that the managers or directors of a corporation can not be considered as trustees, or prohibited as such from purchasing property or stock of the corporation.

I must consider, therefore, that the fact that a director's taking a security from the board of which he is a member is not fraudulent, not even a badge of fraud ; further, that he has power to act as a member of the board in such case. Were I to concede that the four directors had no power to act, (which I do not by any means,) I entertain no doubt at all of the ratification in this case of the acts giving the note and deed. At the board which ratified the conveyance and note, Alexander was the only person present who is alleged to have been interested as a party to the deed. The ratification was in due form, and equal to a precedent authority. (See 2 Smed. & Mars, 193, 199 ; 12 N. H. 205 ; 24 Pick. 13 ; 5 Hill, 137, 143 ; 1 Pet. C. C. R. 64 ; 1 Johns. Cas. 110 ; 18 Barb. 500 ; 14 Georg. 124 ; 13 id. 46 ; 12 Barb. 27.) Even where there is no express ratification in terms, one will be presumed, in many cases, from mere acquiescence. (1 Watts, 385.) I am unable to perceive the force of the suggestion, that, if an act is done by an insufficient number of directors, such directors ought to be excluded from joining in the ratification of the first proceeding. The petition shows upon its face the ratification, and alleges nothing against its force, as I have already shown. The petition, in my opinion, does not show a case in which the writ of injunction ought ever to have issued. There is nothing, so far as I can perceive, either in law or morals, prohibiting a creditor from using any fair means to secure his debt. Here, there is a security and a note, which has the sanction of at least five directors, against whom nothing by way of interest can be alleged, and this number forms a quorum to do such acts. Can it be said to be a perversion of the trust to secure to the creditors the amount of advances made by them, though they be corporators or stockholders ? I think not.